[No. B059176. Second Dist., Div. Five. July 20, 1992.]

JACK G. ABIFADEL et al., Plaintiffs and Respondents, v.
CIGNA INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Long & Levit, Howard M. Garfield, Michael J. Estrada and Don A. Lesser for Defendant and Appellant.

Westrup, Kincard & Klick, R. Duane Westrup and Mark L. Kincard for Plaintiffs and Respondents.

## OPINION

**GRIGNON. J.**—Defendant and appellant Cigna Insurance Company appeals from a judgment after a court trial in favor of its insureds in a declaratory relief action. The lawsuit arose out of Cigna's denial of coverage for the indemnity and defense of two lawsuits under a "claims made" directors and officers liability policy issued to the Bank of Northern California. Cigna contends there is no substantial evidence that a claim was made during the policy period, and, therefore, the trial court erroneously found coverage under the policy. We reverse.

### FACTS AND PROCEDURAL BACKGROUND[1]

*Formation of the Bank*

The Bank was formed in 1983 and was a member of the Federal Deposit Insurance Corporation (the FDIC). Plaintiff and respondent Orange Bancorp, the Bank's majority shareholder, held 51.3 percent of the Bank's outstanding common stock. The remaining 48.7 percent of the Bank's stock was held by various Northern California investors. Plaintiffs and respondents Jack G. Abifadel, Rudolph C. Baldoni, Martha S. Bhathal, John C. Brown and Edward H. Downer (the former directors) were members of the Bank's board of directors and also Bank officers. The former directors were also members of Orange Bancorp's board of directors and represented Orange Bancorp's controlling interest on the Bank's board.

---

[1]In accordance with California Rules of Court, rule 12(a), we have ordered the trial exhibits transmitted to us to augment the record on appeal.

*The "Claims Made" Policy*

The Bank purchased Cigna's "claims made" directors and officers liability and company reimbursement liability policy effective September 5, 1984, through September 5, 1985. The policy had a $1 million coverage limit. When the policy expired on September 5, 1985, the Bank did not purchase extended or "tail" coverage. The policy covers claims against directors and officers, not claims against the Bank. The Bank is insured only to the extent that it is required to indemnify the directors and officers for a loss. The policy states that "[t]he coverage in this policy is limited to liability for only those claims that are first made against the Directors and Officers (Insureds) while the policy is in force." "Insureds" is defined as all current and subsequent directors and officers of the Bank. The former directors were directors during the policy period.

The policy provided, "[i]f during the policy period any claim or claims are made against the Insureds . . . for a Wrongful Act . . . while acting in their individual or collective capacities as Directors or Officers, the Insurers will pay on behalf of the Insureds . . . [100]% of all Loss . . . , which the Insureds . . . shall become legally obligated to pay . . . ." Although "claim" is not defined in the policy, the policy provides that a claim may be made either orally or in writing. A "potential claim" is described in the policy as "written or oral notice from any party that it is the intention of such party to hold the Insureds responsible for the results of any specified Wrongful Act done or alleged to have been done by the Insureds while acting in the capacity aforementioned . . . [or] any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any such alleged Wrongful Act. . . ."

Claims were required to be made, but were not required to be reported, to Cigna during the policy period in order for coverage to exist. However, potential claims were required to be reported to Cigna during the policy period before actual claims arising from them would be treated as claims made during the policy period.[2]

---

[2]"9. If during the policy period or extended discovery period:

"(a) The Company or the Insureds shall receive written or oral notice from any party that it is the intention of such party to hold the Insureds responsible for the results of any specified Wrongful Act done or alleged to have been done by the Insureds while acting in the capacity aforementioned; or

"(b) The Company or the Insureds shall become aware of any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any such alleged Wrongful Act:

*October 7, 1984, Rosen Meeting and October 17, 1984, Agreement*

Between October 7 and October 10, 1984, a meeting was held to settle a dispute that had arisen between the minority shareholders/directors[3] and plaintiffs. Attorney Harvey Rosen represented the Bank and the minority shareholders/directors. At the meeting Rosen proposed an agreement (the October 17, 1984, agreement) to settle the dispute. The October 17, 1984, agreement was negotiated between counsel for the parties. The agreement gave the minority shareholders/directors the right to sell Orange Bancorp's interest in the Bank to buyers selected by the minority shareholders/directors. Rosen told plaintiffs that if Orange Bancorp did not sign the agreement, he would take whatever legal action was necessary to prevent Orange Bancorp from doing anything with its interest in the Bank. Rosen alluded to mismanagement and a possible misappropriation of some moneys from the Bank to Orange Bancorp in violation of the Bank's investment policy. Rosen stated that he would personally prosecute Downer, even though Downer had no knowledge of the transaction at issue prior to its consummation.

As a result of these discussions, the October 17, 1984, agreement was executed by Orange Bancorp, the Bank and the minority shareholders/directors. The October 17, 1984, agreement gave the minority shareholders/directors the exclusive right until December 31, 1984, "to purchase or arrange the purchase of all 154,000 shares of [Bank] Stock owned by [Orange Bancorp] at a price of $10.40 per share cash, representing an aggregate purchase price of $1,601,600." During the term of the October 17, 1984, agreement, the parties agreed to maintain the Bank "as is," including its officers, articles, bylaws, stock, committees, dividends, contracts and shareholder meetings. The parties also agreed to refrain, during the term of the October 17, 1984, agreement, from "institut[ing] any legal or administrative action or proceeding related to or arising out of the ownership or control of [the Bank], any investment in [the Bank] or the management or

"and shall in either case during such period give written notice as soon as practicable to the Insurers of the receipt of such written or oral notice under Clause 9(a) or of such occurrence under Clause 9(b), then any claim which may subsequently be made against the Insureds arising out of such alleged Wrongful Act shall, for the purposes of this policy, be treated as a claim made during the policy year in which such notice was given or if given during the extended discovery period as a claim made during such extended discovery period.

"The Company or the Insureds shall, as a condition precedent to the Insureds' right to be indemnified under this policy, give to the Insurers notice in writing as soon as practicable of any claim made and shall give the Insurers such information and cooperation as they may reasonably require and as shall be [in] the Insureds' power.

"For the purpose of the above clauses notice to that individual named under item VII of the Declarations shall constitute notice to the Company or the Insureds."

[3]John M. Allen, James R. Grube, Grady L. Jeter, Bernard Panella, Norman Peduzzi, and Robert W. Rychlik.

conduct of its affairs." The minority shareholders/directors agreed to resign effective January 4, 1985, if the sale of stock were not effected by December 31, 1984. The Bank and the minority shareholders/directors agreed to hold Orange Bancorp and its representatives harmless from any claim arising out of this sale. Apparently, the minority shareholders/directors did not exercise their right to sell Orange Bancorp's shares.

*April 10, 1985, Department Examination and June 25, 1985, Department Letter*

Between December 31, 1984, and April 10, 1985, the California State Banking Department (the Department) and the FDIC sent examiners to the Bank to review its operations and its loan portfolio. The examiners found generally the "condition of the [B]ank . . . to be less than totally satisfactory, due to the apparent lack of adequate leadership and supervision provided by the Board of Directors, and unprofitable operations since the [B]ank's inception in March 1983."

Based upon the examiners' specific findings, the Department issued and served on the board of directors a June 25, 1985, letter and an April 10, 1985, examination report. The examination report was sent for the Bank's "review and retention in [its] files." It informed the Bank's board of directors that the Bank "was found to be in less than satisfactory condition due to poor management which has resulted in excessive operating losses. [The] [l]osses are due to a combination of excessive loan losses and excessive expenses. Board conflicts and various sale proposals have contributed to the instability." The letter asked for a "reply to the [examination report] prior to July 25, 1985," including confirmation that all losses had been "charged off," a progress report on all substandard assets, a progress report on efforts to hire a full-time chief executive officer, a report on the Bank's plan to increase its reserve for bad debts, budget plans, a report on diversification of the loan portfolio from its excessive concentration in construction lending, corrective actions on statutory violations[4] and a progress report on operational matters.

*The August 7, 1985, Sale and Resignation of the Former Directors*

On August 6, 1985, plaintiffs voted to sell Orange Bancorp's interest in the Bank to seven purchasers who are not parties to this action (the seven

---

[4]The statutory violations are as noted on pages 2 and 2-1 of the examination report and consist of lack of an annual director's examination of the Bank since 1983, lack of the proper filing of directors' oaths, loans in excess of the Bank's lending limit, the improper payment of interest on a demand deposit account, a July 19, 1984, commercial building loan in violation of Financial Code section 1227, a June 28, 1983, commercial building loan that exceeded the Bank's unsecured lending limit and a May 31, 1984, commercial loan that also exceeded the Bank's unsecured lending limit.

purchasers). On August 7, 1985, the sale of the shares of stock was completed and five of the seven purchasers became Bank directors, replacing the former directors who resigned on the same date. The sale of Orange Bancorp's interest in the Bank did not have the prior approval of the Department, as required by Financial Code section 700 et seq.

## August 23, 1985, Cease and Desist Order

In August 1985, the Department received information about the change in control in the Bank and two bank examiners were sent to investigate.[5] On August 23, 1985, pursuant to Financial Code section 1912,[6] the Department issued and served a written cease and desist order on the Bank and its management, the five new directors. Plaintiffs were not served with the order. The cease and desist order was received by the Bank before September 5, 1985, the end of the policy period. Cigna did not receive notice of the cease and desist order during the policy period.

The cease and desist order enjoined the Bank from engaging in "unsafe and injurious" banking practices. The cease and desist order specifically found the following unsafe banking practices: the failure to obtain prior Department approval of the August 7, 1985, sale of stock;[7] the purchase after August 13, 1985, of at least $2.7 million in brokered deposits; the booking, after August 8, 1985, of three substandard and out of area loans in the amount of $676,000; the hiring of an unqualified senior lending officer on August 14, 1985; the absence of a chief executive officer; the maintenance of a deficient reserve for loan losses as of August 21, 1985; and the illegal use of nondirectors as voting members in violation of Corporations Code section 311 and the Bank's bylaws. The Bank was ordered, on the basis of the above findings, to "cease and desist" from making questionable loans and to comply with statutory bank management protocols and standards as follows:

---

[5]Alida Buchanan, who was employed as a bank examiner and supervising attorney by the Department, participated in an investigation. Buchanan testified at trial that the range of enforcement options the Department considered in August 1985 when it learned of the change in control of the Bank was limited to the seizure of the Bank and the actions actually taken in the subsequent cease and desist order. Legal action in terms of an order against any of the individual directors of the Bank was not considered. The Department did not pursue legal remedies against the individual directors of the Bank.

[6]Financial Code section 1912 provides that "[i]f it appears to the superintendent that a bank . . . is violating or failing to comply with its articles or with any law of this state, he may direct such bank . . . to comply with its articles or with the law by an order issued over his official seal, or if it appears to the superintendent that any bank . . . is conducting its business in an unsafe or injurious manner he may in like manner direct it to discontinue the unsafe or injurious practices. The order shall require the bank . . . to show cause before the superintendent at a time and place to be fixed by him why the order should not be observed."

[7]Subsequently, as a result of this violation, voting rights of this stock were restricted for three years.

"1. Respondent [the Bank] shall immediately cease and desist from purchasing brokered deposits . . . .

"2. Respondent [the Bank] shall within 30 days submit a plan to the Superintendent [of the Department] for the reduction of its brokered deposits . . . .

"3. Respondent [the Bank] shall hire and maintain executive management acceptable to the Superintendent [of the Department].

"4. Respondent [the Bank] shall immediately cease and desist from making out-of-area loans until such time as Respondent [the Bank] has submitted a new loan policy to the Superintendent [of the Department], which policy shall include Respondent's [the Bank's] loan policies for out-of-area loans and which is acceptable to the Superintendent [of the Department].

"5. Respondent [the Bank] shall immediately cease and desist from violating the laws of the State of California; namely, Corporations Code Section 307[c] and Corporations Code Section 311 and its Bylaws by permit[t]ing only directors of Respondent [the Bank] to be voting members of committees on its board.

"6. Respondent [the Bank] shall, on or before September 30, 1985, restore its reserve for loan losses to an adequate level."[8]

Within a few days of August 23, 1985, a meeting took place during which the Department presented the cease and desist order to the current Bank directors. A representative of the FDIC was present. The entire cease and desist order was discussed at that meeting and also issues concerning the change of control of the Bank. The purpose of the meeting was to stop certain Bank practices and "to go over the order and make sure it was understood thoroughly and to impress on the board how serious [the Department] was about it." The current directors were asked to attend the meeting.

*Kelly I Lawsuit*

On September 16, 1986, a lawsuit (the Kelly I lawsuit) was filed in the United States District Court. The Kelly I lawsuit was brought by minority

---

[8]The Department did not move to sanction individual bank officers or directors under Financial Code section 1913.5.

shareholders/directors of the Bank[9] against Orange Bancorp, the former directors and the seven purchasers. It alleged that Orange Bancorp and the former directors had breached their fiduciary duties by selling Orange Bancorp's controlling interest in the Bank to the seven purchasers who had mismanaged and looted the Bank for personal gain. It also alleged federal securities laws and RICO violations. The lawsuit asserted no claims for actions of the former directors, other than in connection with the sale of the controlling interest in the Bank. Plaintiffs were served with the Kelly I lawsuit no earlier than October 1986.

*FDIC Lawsuit and the Bank's Closure*

On September 24, 1986, the Bank filed a lawsuit (the FDIC lawsuit) in state court against Orange Bancorp, the former directors and the seven purchasers for negligence and mismanagement.[10] It alleged specifically that plaintiffs had breached their fiduciary duties owed to the Bank.

On November 14, 1986, the Department found the Bank's operations to be unsound and unsafe with no reasonable prospect for rehabilitation. The Department issued an order taking possession of the Bank. The order taking possession found that as of October 31, 1986, the Bank had a "deficit retained earnings in an amount exceeding 40 percent of its contributed capital." This deficit, in contributed capital, meant the Bank was impaired for the purposes of banking law as set forth in division 1 of the Financial Code. The order also found the shareholders' equity in the Bank was seriously inadequate, and the Bank had net losses of $302,000 in 1983, $329,000 in 1984, $742,000 in 1985 and for the period January 1, 1986, through October 31, 1986, $1,287,000. The order found further that the Bank was "seriously illiquid" and was conducting its business in an unsafe manner.

The Department ordered the final liquidation of the Bank based on the findings in the order taking possession. The Bank was closed by the Department. On November 16, 1986, the FDIC was appointed receiver to take control of and liquidate the Bank.

On December 11, 1986, the FDIC, as receiver, became a party plaintiff in the FDIC lawsuit and removed it to the United States District Court, where it was consolidated with the Kelly I lawsuit. The FDIC alleged the

---

[9]The policy excludes from coverage lawsuits brought by directors and officers or former directors and officers of the Bank (Endorsement No. 11—the "Insured vs. Insured" exclusion).

[10]The policy does not exclude from coverage lawsuits brought by the Bank, the Department, or the FDIC.

former directors breached the duty owed as the Bank's directors in the management of the Bank and in selling a majority interest in the Bank to the seven purchasers without adequate investigation. Plaintiffs were served with the initial complaint in the FDIC lawsuit no earlier than October 1986.

## Kelly II Lawsuit

Defendants in the Kelly I lawsuit (plaintiffs herein) obtained a ruling that the Kelly I plaintiffs' derivative claims of breach of fiduciary duty were properly brought by the FDIC as successor to the Bank's interests, and Kelly I was consolidated with the FDIC lawsuit. Thereafter, the Kelly I plaintiffs brought another suit in United States District Court in September 1989 (Kelly II). Kelly II contained almost the identical allegations as Kelly I, but asserted direct claims rather than derivative ones. It alleged that plaintiffs herein induced the Kelly II plaintiffs to acquire and retain their Bank shares by misrepresentation and concealment. Plaintiffs were served with the Kelly II action no earlier than October 1989.

By December 1990, all federal claims in the FDIC and Kelly II lawsuits were eliminated due to settlement with the FDIC and summary adjudication rulings. The United States District Court returned the pendent state claims to state court.[11]

## Notification

On November 6, 1987, more than one year after the lawsuits were served and more than two years after the policy period expired, plaintiffs notified Cigna by letter of the FDIC and Kelly I lawsuits. Plaintiffs, having already incurred more than $50,000 in defense costs, requested in writing that Cigna defend and indemnify plaintiffs under the policy in connection with those lawsuits. The insureds notified Cigna of the pendency of the FDIC and Kelly I lawsuits and requested that Cigna assume the defense of these actions. The letter stated: "Copies of the two complaints are attached. [¶] This letter constitutes notice of claim to the extent you have not been notified already, tender of defense and request for reimbursement of defense costs already incurred in defending these matters."

In March of 1988, while in possession of the amended complaints in those lawsuits, Cigna notified plaintiffs that they were not covered for the FDIC or

---

[11]On March 5, 1991, the Kelly plaintiffs filed a complaint against plaintiffs in state court (Kelly III). The Kelly III plaintiffs alleged claims of breach of fiduciary duty, fraud and conversion. This case is apparently still pending on appeal after a jury verdict in favor of the Kelly III plaintiffs.

the Kelly I lawsuits, because the claims were first made when the suits were filed in September of 1986, after the policy period had expired. The letter stated:

"We have been informed that the FDIC Complaint was filed on December 15, 1986, and that the Kelly [I] complaint was filed on September 16, 1986. Our records indicated that the policy expired on September 5, 1985, without renewal or exercise of the extended discovery period. Inasmuch as Section I of each of the Directors and Officers Liability Policy and the Company Reimbursement Liability Policy limits coverage to claims made during the policy period, neither the *FDIC* claim or the *Kelly* claim is covered by the policy."

*The Instant Lawsuit*

On August 3, 1989, plaintiffs filed this action for declaratory relief, breach of contract, breach of the covenant of good faith and fair dealing, and contribution against Cigna. Plaintiffs alleged that Cigna had a duty to defend and indemnify them for their acts and omissions during their term as directors and officers of the Bank, and Cigna breached its duty and damaged them in that they had to retain and pay their own attorneys. Plaintiffs sought a determination of the parties' rights under the policy and damages for breach of the covenant of good faith and fair dealing.[12] Plaintiffs requested compensatory and punitive damages and contribution and reimbursement for Orange Bancorp, because it paid and contributed to the other plaintiffs' defense. The insurance policy was attached to the complaint.

On October 6, 1989, Cigna answered by denying all allegations and claiming as affirmative defenses that: punitive damages were unconstitutional; plaintiffs had failed to comply with the policy's notice requirement provision; the claims were excluded under the policy; recovery was contrary to public policy; and the action was frivolous under Code of Civil Procedure section 128.5.

On April 30, 1990, a one-day bench trial was held.[13] Cigna filed a motion *in limine* to exclude evidence, including expert testimony, relative to the

___

[12] On March 28, 1990, the trial court granted plaintiffs' request for dismissal without prejudice of their cause of action for breach of the covenant of good faith and fair dealing.

[13] In April of 1990, plaintiffs filed a trial memorandum asserting that: (1) the August 23, 1985, meeting between the Bank directors, the Department and the FDIC was an oral claim; and (2) the cease and desist order was a written claim. Plaintiffs argued that items 1, 4 and 6 of the cease and desist order required the directors and officers to stop certain actions, items 2, 3 and 5 demanded certain services to be performed by the directors and officers and these services constituted a claim under the policy. Plaintiffs contended that the policy interpretation was a matter of law.

On April 30, 1990, Cigna filed a trial brief, arguing that the policy is unambiguous, and that no claims were made against plaintiffs during the policy period, because the FDIC and the

meaning of the word "claim," contending extrinsic evidence was irrelevant to the interpretation of the policy. The trial court excluded each of the parties' expert witnesses on this topic. The parties filed a stipulation of facts for use at the trial. The trial court bifurcated the trial sua sponte and tried only the issue of whether a claim had been made. The parties also stipulated that eight premarked exhibits would be admitted into evidence as relevant to the issue of whether a claim had been made. The trial court then, over the objection of Cigna, admitted the October 17, 1984, agreement and the June 25, 1985, Department letter into evidence. At the close of plaintiffs' case, Cigna moved for a directed verdict and the motion was denied. Testimony was taken and the matter was submitted. On June 7, 1990, the trial court issued a memorandum of intended decision in favor of plaintiffs. On July 11, 1990, Cigna began funding plaintiffs' defense under a reservation of rights. Cigna's request for reconsideration was denied.

### Trial Court's Findings and Judgment

On April 17, 1991, the trial court issued its statement of decision in which it found that the claims made in the FDIC and Kelly lawsuits were first asserted in the cease and desist order which, although directed to the Bank, made express findings about the former directors who acted for the Bank. The trial court concluded that the cease and desist order was a claim under the policy for purposes of the FDIC and Kelly lawsuits.

On May 24, 1991, a final judgment, with specific findings and determinations, was filed. The trial court found that the Department's June 25, 1985, examination report, alleging poor management and other complaints, mirrored the allegations in the cease and desist order and the subsequent FDIC and Kelly lawsuits.[14] The trial court found coverage and indemnification under the policy for the FDIC and the Kelly lawsuits.

Cigna timely appealed from the judgment.

---

Kelly I claims were not made during the policy period, nor was Cigna notified of them. Cigna also argued that any assertion that the earlier cease and desist order and meeting constituted a potential claim was not valid, and, even if it were, no notice had been given to plaintiffs or Cigna of the potential claims, thus, there was no coverage. Furthermore, Cigna asserted that even if the claims were covered, plaintiffs were not entitled to relief because there was no duty to defend the type of actions taken.

[14]The trial court did not find that the examination report and Department letter constituted a claim within the policy period. The trial court found that the allegations of mismanagement, set forth in the examination report, were included in the cease and desist order.

## Discussion

### Waiver of Defenses to Coverage

On appeal, Cigna contends, as a matter of law, that the August 23, 1985, cease and desist order did not constitute a claim against the former directors within the meaning of the policy. Plaintiffs respond that not only does the cease and desist order constitute a claim against the former directors, but the Rosen demands and other regulatory agency directives also constitute claims against the former directors within the policy period.

Plaintiffs contend further Cigna has waived its right to assert as defenses to coverage "all grounds not specified in its rejection [of coverage] letter, including without limitation, the contention that the Rosen demands, the [examination] report, the June 25th letter and the August 23, 1985 [cease and desist] order were not claims under the policy." Plaintiffs argue that Cigna's March 1988 denial of coverage letter was based solely on the ground that the FDIC and Kelly lawsuits had not been filed during the policy period. Cigna did not deny coverage on the grounds that the Rosen demands and prior regulatory agency directives did not constitute claims. (See *Garcia* v. *Calfarm Ins. Co.* (1992) 6 Cal.App.4th 885, 893-894 [7 Cal.Rptr.2d 504].)

We address first whether plaintiff may raise the issue of waiver of defenses to coverage on appeal. It is well settled that an appellate court will not consider arguments not raised in the trial court. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].) We review the record to determine whether this issue was raised in the trial court.

Footnote 9 of plaintiffs' trial brief states:

"The Exclusion 11 [Insured vs. Insured] defense is subject to Plaintiffs' motion in limine which was filed concurrently with this trial memorandum and the arguments are given without prejudice to Plaintiffs' contention that the Exclusion 11 defense has been waived by Cigna."

The motion *in limine* is not part of the record on appeal. We can find no other references to waiver of defenses to coverage in the record. Moreover, Cigna asserts in its reply brief that plaintiffs failed to raise, in the trial court, the issue of waiver in connection with the Rosen demands and the examination report.

We conclude that the only issue relating to waiver of defenses to coverage raised in the trial court concerned the "Insured vs. Insured" exclusion.

Accordingly, plaintiffs have failed to preserve for appeal the issue of Cigna's waiver of other defenses to coverage.[15]

*Coverage for Claims and Potential Claims*

Coverage under the "claims made" policy involved in this case depends solely on whether a *claim* was made during the time the policy was in force. (*Hill* v. *Physicians & Surgeons Exchange* (1990) 225 Cal.App.3d 1, 5 [274 Cal.Rptr. 702].) The parties stipulated that Cigna was not notified of any *potential claim* during the policy period. Under the terms of the policy, there is no coverage for any potential claim unless notice is given during the policy period. (See *Slater* v. *Lawyers' Mutual Ins. Co.* (1991) 227 Cal.App.3d 1415, 1421-1424 [278 Cal.Rptr. 479].)

■ The interpretation of a contract is a question of law when the contract terms are unambiguous. However, when extrinsic evidence is required to determine the intent of the parties to the contract, the interpretation becomes a question of fact for the trier of fact. (*Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675]; see *Gyler* v. *Mission Ins. Co.* (1973) 10 Cal.3d 216, 219-220 [110 Cal.Rptr. 139, 514 P.2d 1219] [the phrase "claims made" is not ambiguous].) We review the trial court's determination that a claim was made by deciding whether there is substantial evidence to support any factual findings. (*Phoenix Ins. Co.* v. *Sukut Construction Co.* (1982) 136 Cal.App.3d 673, 677 [186 Cal.Rptr. 513].)

■ An insurance policy is a contract between the insurer and the insured. To determine the obligations of the parties, we must look at the language of the contract. (*Stein* v. *International Ins. Co.* (1990) 217 Cal.App.3d 609, 613 [266 Cal.Rptr. 72].) It is well established that an insurance policy must be interpreted as a whole with each clause lending meaning to the other. (*Winkler* v. *National Union Fire Ins. Co.* (9th Cir. 1991) 930 F.2d 1364, 1366; *Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916-917 [226 Cal.Rptr. 558].)

■ A basic canon of insurance policy construction is that the words used in it are to be interpreted according to the plain meaning that a layperson would ordinarily attach to them. A court cannot adopt a strained or absurd interpretation in order to create an ambiguity where none exists. However, where there is any ambiguity or uncertainty in an insurance policy then it is

---

[15]The issue of whether Cigna waived its right to assert the "Insured vs. Insured" exclusion is properly before us. However, because we conclude that no claim was made during the policy period, we need not reach the exclusion of coverage issue.

to be resolved against the insurer. The contract must be given a construction which will fairly achieve its objective of providing indemnity for losses related to the insurance. This canon of construction is applied to the language of insurance policies, which are drafted by the insurer, to assure that the insured's reasonable expectation of coverage is protected. The effect of its application is different for clauses which provide coverage and those that limit coverage. Coverage clauses are interpreted broadly to afford the insured the greatest possible protection. Clauses limiting coverage are construed narrowly. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764].)

■ In defining "claims," the law focuses on the claimant's formal demands for service or payment and does not recognize a request for an explanation, the expression of dissatisfaction or disappointment, mere complaining, or the lodging of a grievance as a claim. In both its ordinary meaning and in the interpretation given to it by other courts in similar circumstances, a claim is a demand for something as a right or as due. A formal lawsuit is not required before a claim is found to have been made. (*Hill* v. *Physicians & Surgeons Exchange, supra*, 225 Cal.App.3d at pp. 5-6; *Phoenix Ins. Co.* v. *Sukut Construction Co., supra*, 136 Cal.App.3d at p. 677.) A claim is the assertion of a liability of the party, demanding that the party perform some service or pay some money. (*Hill* v. *Physicians & Surgeons Exchange, supra*, at pp. 5-7.) A claim is a demand or challenge of something as a right and asserts the liability of the party from whom a service or sum of money is requested. (*Williamson & Vollmer Engineering, Inc.* v. *Sequoia Ins. Co.* (1976) 64 Cal.App.3d 261, 269 [134 Cal.Rptr. 427].)

In *Hill, supra*, 225 Cal.App.3d.1, the patient who had been assigned her physician's rights under his "claims made" insurance policy, asserted that she had made a claim within the policy period. During the policy period, surgery was performed on her. Also during the policy period, she complained of the results of the surgery. Her physician acknowledged that she should not have the complained-of problems as a result of the surgery and did not bill for his services. After the policy period expired, the patient sent a notice of intent to sue to the physician. The Court of Appeal found the patient had neither made a demand of nor asserted a right against the physician within the policy period. It held that a claim had not been made within the policy period.

In *Phoenix Ins. Co., supra*, 136 Cal.App.3d 673 an attorney executed a mechanic's lien in 1972, that did not adequately protect his client's interest. In 1975, when the client discovered the problem, he met with the attorney and asked him to correct the problem with the lien without further compensation. The attorney said that he would undertake to correct the lien subject

to three conditions. The client rejected the conditions and the attorney did no further work on the matter. In a May 5, 1976, letter the client notified the attorney that he was holding the attorney responsible for damages resulting from the defective lien. On August 16, 1976, the client filed a legal malpractice action. The attorney had been covered by a "claims made" insurance policy effective from January 4, 1975, through January 4, 1976. This district held that the client's meeting with the attorney in 1975 was a "demand that [the attorney] correct and complete work for which payment had already been made," and thus, constituted a claim within the policy period.

In this case, claim is not defined in the policy. "We assess its meaning, however, in light of the overall structure of the policy and its specific provisions." (*Winkler* v. *National Union Fire Ins. Co., supra,* 930 F.2d at p. 1366 [applying California law].)[16] The policy does draw a distinction between claims actually made and those that are threatened or potential. It is clear, therefore, that there is some meaningful distinction between a claim and a potential claim within the meaning of the policy. (*Ibid.*) Accordingly, we must consider whether the asserted acts constitute claims by reference to the definition of potential claim in the policy. The policy at issue includes the following unambiguous description of a potential claim: "written or oral notice from any party that it is the intention of such party to hold the Insureds responsible for the results of any specified Wrongful Act done by the Insureds while acting in the capacity aforementioned . . . [or] any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any such alleged Wrongful Act. . . ." As noted previously, there is no issue in this case as to whether coverage can be based on potential claims. It is undisputed that potential claims must be noticed to the insurer within the policy period and no such notice was given. Thus, in light of the overall structure of the policy, a claim is not threatened action, accusation of misconduct, or mere notice of an intention to hold an insured responsible for a wrongful act. (*Id.* at pp. 1366-1367.)

*The Rosen Meeting and the October 17, 1984, Agreement*

 Plaintiffs contend that Rosen made demands on behalf of the minority shareholders/directors which constitute a claim within the policy period. Plaintiffs contend that Rosen made demands on them concerning mismanagement, misappropriation of assets, violation of lending policies,

---

[16]In *Winkler*, the directors of a corporation were informed that the corporation was in serious financial condition and a sale of assets might be necessary. At an informal meeting with shareholders, two heirs of the controlling shareholder "announced their intention 'to take whatever legal action necessary to recoup their supposed losses.'" The Ninth Circuit held that such threatened legal action constituted merely a potential claim and not a claim.

and wrongful attempts to sell Orange Bancorp's majority interest in the Bank. Plaintiffs contend further that Rosen demanded they remedy the deficiencies or that legal action would be taken. Finally, plaintiffs contend the trial court specifically found that Rosen made a claim against the former directors.

Plaintiffs' contentions are not supported by the record. The only evidence relating to the Rosen demands is found in the October 17, 1984, agreement and some brief testimony by Downer authenticating the agreement. Downer testified that he had attended a meeting with Rosen in October of 1984, to discuss an agreement to settle a dispute between the directors. At the meeting, Downer testified, Rosen alluded to a transaction involving the transfer of moneys from the Bank to Orange Bancorp, which transaction purportedly violated the Bank's investment policy and constituted mismanagement and possibly misappropriation of the Bank's assets. Finally, Downer testified that Rosen indicated "he would personally prosecute me even though I had no knowledge of the transaction prior to its consummation." Downer testified that as a result of this meeting, the October 17, 1984, agreement was executed. Rosen did not testify.

The October 17, 1984, agreement makes no reference to the settling of any dispute. In fact, it is not clear from the record just what the dispute was between Orange Bancorp and the minority shareholders/directors.[17] The former directors were not parties to the agreement. The agreement merely gave the minority shareholders/directors a right to sell Orange Bancorp's controlling interest in the Bank. It made no demand or claim upon the former directors.

As to the findings of the trial court, the record reflects the trial court expressly found that the cease and desist order constituted a claim within the policy period which was the basis of both the FDIC and Kelly lawsuits. The trial court stated that the cease and desist order reflected "the same demands which were made upon the Plaintiffs by [Rosen] in or about September of 1984." The trial court did not expressly find that the Rosen demands constituted a claim.

Moreover, the Kelly lawsuit does not contain any claims based on the 1984 Rosen demands or the October 17, 1984, agreement. That lawsuit is based solely on claims arising out of the August 1985 sale of Orange Bancorp's controlling interest in the Bank to the seven purchasers.

---

[17]Apparently, Orange Bancorp had attempted unsuccessfully on two occasions in 1984 to sell its controlling interest in the Bank. On both occasions, the Bank, by its minority shareholders/directors, opposed the sale on the ground that the proposed purchasers were unsuitable. The Bank incurred substantial legal fees in opposing the sales.

We conclude the trial court did not find the Rosen demands and the October 17, 1984, agreement constituted a claim made against the former directors within the policy period, which was the basis of the FDIC and Kelly lawsuits. We conclude further that any such finding would not have been supported by substantial evidence.

The October 17, 1984, agreement and the Rosen demands evidence a demand against Orange Bancorp apparently related to Orange Bancorp's unsuccessful attempts to sell its controlling interest in the Bank. The demands were settled by execution of the October 17, 1984, agreement permitting the minority shareholders/directors to sell Orange Bancorp's controlling interest. There is nothing in the October 17, 1984, agreement which evidences any demands or claims against the former directors. The directors and officers liability policy insures against claims against the directors and officers, not against Orange Bancorp. The Bank is also insured under the company reimbursement liability policy only if it is required to reimburse or indemnify its directors and officers for claims made against them. It is clear, and plaintiffs do not contend differently, that a claim against a majority shareholder is not a claim against the individual directors within the meaning of the policy.

We are left with a brief segment of testimony by Downer in which he states that at the October 1984 meeting, Rosen referred vaguely to a single transaction which allegedly reflected a violation of lending policies, mismanagement and misappropriation and threatened to prosecute Downer personally. As noted previously, even were this statement to be construed as a claim, it is not the basis of the Kelly lawsuits. In addition, the construction of the foregoing as a claim could only be considered a claim against Downer and not the other four former directors.

Although the FDIC lawsuit is based in part on allegations of mismanagement and misappropriation by the former directors, we conclude the foregoing statement cannot reasonably be construed as a claim within the meaning of the policy. Rosen did not demand services or payment from Downer. Demands asserted against Orange Bancorp, the majority shareholder, do not constitute personal demands against the directors and officers of the Bank. Rosen did not demand anything of Downer as his right or due. His statement constitutes a mere complaint or lodging of a grievance without a demand for compensation.

Under the terms of the policy, the Rosen statement constituted only a potential claim. The statement indicated that Rosen would hold Downer personally responsible for the results of any lending policy violations,

mismanagement or misappropriation arising out of the referenced transaction. That is exactly the definition of a potential claim in the policy. If the Rosen statement is treated as a claim, then the term "potential claim" has no different meaning, and the language would be merely surplusage.

In summary, there is no substantial evidence in the record to support a finding that the 1984 Rosen demands and the October 17, 1984, agreement constitute a claim within the policy period against the former directors and officers on which the FDIC and Kelly lawsuits were based.

*Regulatory Agency Directives*

 Although we have not been cited to, nor have we found, any California case which deals directly with the issue of whether regulatory agency directives constitute claims against directors and officers under "claims made" director and officer liability policies, the Ninth Circuit, when confronting the issue, has found that, under California law, directives from regulatory agencies, including cease and desist orders and supervisory agreements, do not generally constitute claims against directors and officers under "claims made" director and officer liability policies. (*California Union Ins.* v. *American Diversified Sav.* (9th Cir. 1990) 914 F.2d 1271; *Burns* v. *International Ins. Co.* (N.D.Cal. 1989) 709 F.Supp. 187, affd. on other grounds (9th Cir. 1991) 929 F.2d 1422; cf. *Mt. Hawley Ins.* v. *Federal Sav. & Loan Ins. Corp.* (C.D.Cal. 1987) 695 F.Supp. 469.) Such directives requiring compliance with banking laws and regulations constitute claims against the directors or officers only where the regulatory agency asserts liability of the directors or officers for any misconduct under investigation, seeks money damages from the directors or officers, threatens formal proceedings against directors or officers for failure to comply, or proposes to hold the directors or officers personally liable for the deficiencies. (*California Union Ins.* v. *American Diversified Sav.*, *supra*, at p. 1276.) "The term 'claim' should not be interpreted so broadly as to include a regulatory agency's request of the insured to comply with regulations where, as here, the agency did not directly threaten [the Bank] with liability, it made no 'money demand,' [citation] or 'demand or challenge [ ] something as of right.' [Citations.]" (*Id.* at p. 1277.)

In *California Union Ins.*, *supra*, 914 F.2d 1271, the Ninth Circuit found no coverage under a claims made directors and officers liability policy, for a former director of a bank sued by the Federal Savings and Loan Insurance Corporation (FSLIC), after the expiration of the policy period, for alleged breaches of duty resulting in losses sustained by the bank. The alleged breaches of duty related to the former director's failure to maintain adequate

and accurate records of transactions and the existence of conflicts of interest. The former director asserted that the following constituted claims within the policy period: (1) a Federal Home Loan Bank Board letter informing the bank of certain accounting deficiencies and requesting the bank to remedy them; (2) a state regulatory agency cease and desist order resulting from the bank's accounting procedures and prohibiting the bank from investing in or transferring assets to related corporations; (3) an FSLIC and state regulatory agency advisement of statutory and regulatory violations which would result in formal enforcement proceedings against the bank unless the directors agreed to enter into a supervisory agreement; (4) a supervisory agreement entered into by the bank and FSLIC; (5) a state regulatory agency special examination for which the bank was required to pay; and (6) an agreement between the bank and the state regulatory agency to rescind the cease and desist order in exchange for the bank's acceptance of certain conditions. The Ninth Circuit held that none of the letters, communications, orders, or agreements of the various bank regulatory agencies, either individually or collectively, constituted a claim against the former director under the terms of the policy.

In arriving at its decision, the Ninth Circuit noted that two district court decisions applying California law in this context were in conflict. In *Mt. Hawley Ins.* v. *Federal Sav. & Loan Ins. Corp.*, *supra*, 695 F.Supp. 469, the district court held that threatening letters from FSLIC, demanding compliance by the directors and officers with relevant laws and regulations, constituted a claim made against the directors and officers. In *Burns* v. *International Ins. Co.*, *supra*, 709 F.Supp.187, the district court held that a FSLIC investigation and supervisory agreement were not claims but merely potential claims. The Ninth Circuit found the reasoning of the *Burns* court to be more persuasive.[18] We find the reasoning of the Ninth Circuit to be persuasive. (See also *MGIC Indem. Corp.* v. *Home State Sav. Ass'n.* (6th Cir. 1986) 797 F.2d 285, 288 [Savings association's settlement of criminal charges, by agreeing to make restitution of certain fees in exchange for agreement not to criminally prosecute officers, is not claim for wrongful acts of officers. "[A] claim that a wrongful act has occurred is not the same thing as a claim for payment on account of a wrongful act."]; *Branning* v. *CNA Ins. Companies* (W.D.Wn. 1989) 721 F.Supp. 1180, 1183 [FSLIC cease and desist order a potential claim].)

In this case, plaintiffs contend that the Department issued and served an examination report and letter that constitutes a claim within the policy period. Plaintiffs argue that these documents essentially mirrored the Rosen demands and later claims set forth in the cease and desist order and the Kelly and FDIC lawsuits.

---

[18]Subsequently, the district court decision in *Burns* was affirmed by the Ninth Circuit on other grounds.

The examination report was simply a report of the inadequacies or deficiencies found in the Bank's operations after an examination which took place in the first few months of 1985. It noted generally that the Bank had inadequate leadership and supervision and was generally unprofitable. It made no request for payment or services or allegation of liability for any wrongful act. At most, it simply set forth some data and behavior which could subsequently give rise to a claim. It is clearly not a claim, but constitutes merely a potential claim within the meaning of the policy.

The June 25, 1985, Department letter, which enclosed the examination report, notified the Bank that it was in less than satisfactory condition and requested confirmations, reports, progress reports, and corrective actions on certain statutory violations. The letter stated: "We would appreciate receiving a reply to the Examination Report prior to July 25, 1985." None of these requests constituted demands for services or sums of money. They did not threaten any formal consequences against the former directors for failure to correct the deficiencies, nor propose to hold the former directors personally liable. They are notice of specific behavior or acts which could subsequently give rise to a claim against plaintiffs if not corrected. This is also a potential claim under the policy. We conclude that neither the examination report nor the Department letter amounted to any assertion of liability for any conduct which had been investigated. (See *California Union Ins.* v. *American Diversified Sav.*, *supra*, 914 F.2d at p. 1276.) Thus, there is no substantial evidence to support a finding that either the examination letter or the Department letter constitute a claim which provides a basis for the FDIC and Kelly lawsuits.[19]

Plaintiffs further contend that the cease and desist order constitutes a claim under the policy. The cease and desist order issued pursuant to Financial Code section 1912. It included findings concerning the investigation of the sale of the controlling interest, the purchase of brokered deposits on or after August 13, 1985, the making of substandard loans on or after August 8, 1985, the hiring of an inexperienced senior lending officer on August 14, 1985, the failure to hire a chief executive officer, inadequate loan reserves as of August 21, 1985, and the appointment to Bank committees of two of the new purchasers who were ineligible. All of these deficiencies (other than the sale of the controlling interest) relate to actions which occurred after the former directors resigned. Based on these findings, the Bank was ordered to stop purchasing brokered accounts, reduce its existing brokered accounts, hire an acceptable executive officer, stop making out-of-area loans, comply with its bylaws and increase its loan reserves.

---

[19]As noted previously, the Kelly lawsuit was not based on any allegations of mismanagement by the former directors.

We conclude that the cease and desist order did not constitute a claim against the former directors for a number of reasons. First, the cease and desist order was directed to the Bank and not to the directors of the Bank. Second, it relates to activities which took place after the resignation of the former directors. Third, it threatens no formal consequences against the Bank or directors for failure to comply with its order. Finally, it does not propose to hold the former directors personally liable for the deficiencies.[20]

## CONCLUSION

There is no substantial evidence in the record that either the Rosen demands and October 17, 1984, agreement, the Department examination report and letter, or the cease and desist order constitute claims against the former directors during the policy period within the meaning of the directors and officers liability policy. Accordingly, the judgment of the trial court, finding coverage under the policy, is not supported by substantial evidence. In light of this conclusion, we need not reach the remaining issues raised by the appeal.

## DISPOSITION

The judgment is reversed. Cigna is to receive its costs on appeal.

Turner, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied August 6, 1992.

---

[20]We have concluded that the regulatory agency directives do not individually constitute a claim. We also conclude that the regulatory agency directives do not collectively constitute a claim.