930 F.Supp. 825 (1996)
The HOME INSURANCE COMPANY OF ILLINOIS (NEW HAMPSHIRE), Plaintiff,
v.
SPECTRUM INFORMATION TECHNOLOGIES, INC., Peter T. Caserta, Dana Verrill, A. Werner Pleus, John Rule, Albert Panico, John Sculley, Salvatore Marino, Andrew Migliorini, John P. Bohrman, A.C. Dalton, Joseph H. Allen, Edward N. Maskaly, Christopher T. McGowan, Ronald S. Glassner, Bernard H. Gudvi, Phillip E. Jennings, Kailas J. Rao, and John Does 1-100, Defendants.
No. 95 CV 3744 (FB).
United States District Court, E.D. New York.
July 15, 1996.
*826 *827 *828 Ohrenstein & Brown, New York City, for Home Ins. Co.
Brown & Wood, Jones, Day, Reavis & Pogue, New York City, for Peter Caserta.
Proskauer, Rose, Goetz & Mendelsohn, New York City, for John Sculley.
Cleary, Gottlieb, Steen & Hamilton, Goodkind, Labaton, Rudoff & Sucharow, New York City, for Spectrum Information Technologies, Inc.
Siff Rosen, P.C., New York City, Ross, Dixon & Masback, L.L.P., Washington, DC, for Aetna Casualty & Surety Co.
Peterson & Ross, New York City, for Agricultural Excess & Surplus Insurance Co.
Dominic F. Amorosa, New York City, for Albert Panico.
Mark B. Rosen, Hackensack, NJ, for Dana Verrill, A. Werner Pleus and John Rule.
Lehman & Gikow, New York City, for Joseph Allen.

MEMORANDUM AND ORDER
BLOCK, District Judge:
Plaintiffs Home Insurance Company of Illinois ("Home") and Aetna Casualty and Surety Company ("Aetna") bring this action for declaratory relief and rescission pursuant to 28 U.S.C. §§ 157(d), 1334, and 2201, claiming that none of the defendants in this action (collectively referred to hereafter as "Spectrum" unless otherwise indicated) are entitled to directors' and officers' ("D & O") liability insurance coverage under Home's Renewal Policy ("Renewal Policy") or Aetna's Excess D & O Liability Insurance Policy *829 ("Excess Policy"). Home and Aetna argue that they are entitled to rescind the Renewal and Excess Policies because Spectrum, through certain of its officers and directors, allegedly made material misrepresentations by failing to disclose in its applications for insurance an informal inquiry initiated by the Securities and Exchange Commission ("SEC") and, alternatively, that Spectrum's coverage is precluded by several of the policies' provisions.
The Court held a bench trial on February 28 and 29, 1996 on the rescission issue. The policy coverage issues are the subject of various partial summary judgment motions. For the reasons that follow, the Court determines that (1) Spectrum did not materially misrepresent or fraudulently conceal information in its applications for insurance coverage, and thus, Home and Aetna are not entitled to rescission; and (2) Spectrum's coverage is not precluded by the policy provisions to the extent that the claims are factually unrelated to a pre-existing policy period within the meaning of the Renewal and Excess Policies' exclusionary clauses as fully explained herein.

I.

BACKGROUND
This action arises from the tentative settlement of a consolidated class action brought against Spectrum for alleged violations of the federal securities laws. The settlement includes the payment of approximately $10,000,000 to the class members by various parties involved in the litigation and is contingent upon Home's and Aetna's payment of the face amounts of the Renewal and Excess Policies, each in the sum of $2,000,000. (See Pl.'s Ex. 86.) The relevant facts  either undisputed in the summary judgment submissions or determined by the Court as a consequence of the rescission trial  follow.

A. 1993 "AT & T Lawsuits"
In June 1992, Home issued Spectrum a D & O liability and company reimbursement policy ("Original Policy"), which covered the period from June 26, 1992 to June 26, 1993 ("Original Policy Period"). As with all of the policies discussed herein, this policy was issued on a "claims made" basis.[1] Aetna did not insure Spectrum during this period.
In May 1993, Spectrum shareholders who purchased their Spectrum common stock during that month brought several class action lawsuits against Spectrum. The complaints asserted, inter alia, violations of federal securities laws based on Spectrum's alleged May 1993 public misrepresentations of the value of a licensing agreement between Spectrum and AT & T.[2] On June 21, 1993, The Honorable Leonard Wexler of the Eastern District of New York issued Pre-Trial Order No. 1 pursuant to Rule 50 of this Court's Rules *830 for the Division of Business among District Judges and Rule 42(a) of the Federal Rules of Civil Procedure, which consolidated most of these lawsuits under the caption In re Spectrum Information Technologies, Inc. Securities Litigation ("AT & T Lawsuits"). (Margulis Aff. Ex. B.) Home has acknowledged coverage under the Original Policy for loss arising from the AT & T Lawsuits. (Home's Mem.Supp. Summ.J. at 3; Home 3(g) Stmnt. ¶ 6.)

B. SEC Inquiry
On May 21, 1993, the SEC sent a letter informing Spectrum that it had initiated an "informal inquiry into recent trading and disclosures involving Spectrum[]" ("SEC Inquiry"), and requested that Spectrum voluntarily produce copies of, inter alia, all press releases issued by Spectrum since the beginning of May 1993, Spectrum's agreement with AT & T, all correspondence between Spectrum and AT & T relating to the agreement, research reports and analyst recommendations issued with respect to Spectrum since the beginning of May 1993, and AT & T's May 18, 1993 press release relating to the technology which was the subject of the agreement. (Ahari Aff.Ex. 7.) The letter stated that the inquiry was "confidential and should not be construed as an indication by the Commission ... that any violations of law ... [had] occurred, nor should it be considered an adverse reflection upon any persons, entities or securities." Id. The letter did, however, refer to the SEC's Form 1662, attached to the letter, which described twenty-two routine uses of information provided to the SEC, including the investigation of possible securities laws violations. Id. In a subsequent letter dated October 8, 1993, the SEC requested additional information relating to the AT & T licensing agreement. (Ahari Aff.Ex. 10.) These inquiries allegedly did not become known to the public until January 25, 1994. (Second Am.Compl. ¶ 98; Margulis Aff.Ex. H at 60.)

C. Home's and Aetna's Applications for the Renewal and Excess Policies
On May 27, 1993, Spectrum applied for the Renewal Policy for the coming year with Home, the issuer of the Original Policy, and on June 4, 1993, Spectrum applied for the Excess Policy with Aetna, who had not previously insured Spectrum. Spectrum did not disclose the SEC Inquiry in either its application for insurance with Home or Aetna. Nor did Spectrum reveal the SEC Inquiry to Home during a meeting held on June 7, 1993 regarding its application for the Renewal Policy.

1. Home's Renewal Policy Application

Paragraph 7 of Home's application for the Renewal Policy inquired of Spectrum as follows:
Has the Applicant Corporation (or any subsidiary thereof) and/or any of its directors or officers been involved in the following within the past eighteen (18) months:
(a) any representative action, class action or derivative suit[?]
(b) any civil or criminal action or proceeding investigating or charging a violation of any federal or state security law or regulation?
(c) any other litigation other than ordinary routine litigation incident to the business of the Applicant Corporation (and/or its subsidiaries) and/or its directors and officers?
(Joint Pre-Trial Order ¶ 23.) Spectrum answered Paragraph 7(a) in the affirmative and expounded as follows:
[R]ecent suits alledge[sic] that Spectrum inflated projected income from a recent AT & T deal. Spectrum feels that the suit is without merit and hopes they will be dismissed.
Id. at ¶ 24. Spectrum answered "no" to Paragraphs 7(b) and (c). Id. at ¶¶ 25-26.
Spectrum had also completed an application prior to the issuance of the Original Policy in June 1992 which contained the same Paragraphs 7(a), (b), and (c). Consistent with its answer to Paragraph 7(b) on the 1993 application, Spectrum did not disclose the fact that it was subject to a prior informal SEC inquiry, dated October 10, 1990, regarding sales of restricted stock by Spectrum's officers and directors and promotional *831 materials issued by Spectrum between January 1988 and October 1990. (Joint Ex. 6; Pl.'s Ex. 1; Tr. at 233-35.)[3]

2. Aetna's Excess Policy Application

Paragraph 11(a)(2) of Aetna's application for the Excess Policy contained a similar question to that contained in Paragraph 7(b) of Home's application:
Has any person or entity proposed for this insurance been a party to any of the following: .... Any civil, criminal or administrative proceeding alleging or investigating a violation of any security law or regulation?
(Medina Aff.Ex. B). Spectrum provided the same substantive response to this question that it did to Paragraph 7(a) in Home's policy application:
Yes. Recent class action suit alleges Spectrum overstated potential revenue from a recent AT & T deal. Attorneys for Insured as well as auditors feel the suit will be dismissed.
Id. Paragraph 11 further asked:
(b) No claims have been made against any person(s) proposed for this insurance in their capacity as a director or officer of the Applicant, except as follows (include loss payment and defense costs. If answer is "none", so state)[.]
(c) No person or entity proposed for this insurance is cognizant of any fact, circumstance or situation which they have reason to suppose might afford valid grounds for any claim such as would fall within the scope of the proposed insurance, except as follows (if answer is "none", so state)[.]
Id. Similar to its responses to Home's Paragraphs 7(b) and (c), Spectrum referred to its answer in Paragraph 11(a)(2) in response to Paragraph 11(b) and answered "none" in response to Paragraph 11(c). Paragraph 11 also contained the following language:
Without prejudice to any other rights and remedies of the Underwriter, any claim arising from any claims, facts, circumstances or situations required to be disclosed in response to 11 b) or 11 c), is excluded from the proposed insurance.
Id.
On June 26, 1993, Home issued the subject $2,000,000 Renewal Policy covering the period from June 26, 1993 to June 26, 1994 ("Renewal Policy Period"), and Aetna issued the subject $2,000,000 Excess Policy for the same period.

D. 1994 Renewal Lawsuits
Beginning in February 1994, additional lawsuits were commenced against Spectrum (referred to hereafter as "Renewal Lawsuits" because they were brought during the Renewal Policy Period). (Joint Exs. 39, 41-43, 45-46, 49, 75.) Several of these suits contained the same factual allegations as those in the AT & T Lawsuits as well as facts alleged to constitute other security law violations. These lawsuits included: Mathews v. Spectrum, No. 94 CV 1991 (E.D.N.Y.1994) (Joint Ex. 39), and Bilunka v. Spectrum, No. 94 CV 0529 (E.D.N.Y.1994) (Joint Ex. 42), brought by plaintiffs who purchased Spectrum common stock from October 1993 through February 1994; Grossman v. Spectrum, No. 94 CV 0448 (S.D.Tex.1994) (Joint Ex. 41), and Meyers v. Spectrum, No. 94 CV 1507 (E.D.N.Y.1994) (Joint Ex. 43), brought by plaintiffs who purchased Spectrum common stock, or had options to do so, from May 1993 through February 1994; and Stern v. Spectrum, No. 94 CV 0453 (E.D.N.Y.1994) (Joint Ex. 75), brought by plaintiffs who purchased Spectrum common stock during January 1994. Although the Renewal Lawsuits assert these additional allegations in a myriad of pleading forms, the allegations contained therein can be grouped into four categories of alleged wrongdoing:

1. SEC Inquiry Claims

Various portions of the complaints allege that Spectrum intentionally withheld its knowledge of the SEC Inquiry from the public ("SEC Inquiry Claims"): On January 25, 1994, the SEC Inquiry became known to the *832 public when CNBC Correspondent Dan Dorfman ("Dorfman") reported that the SEC had initiated an investigation into Spectrum and had issued subpoenas requesting information related to Spectrum's agreement with AT & T and Rockwell International. Following Dorfman's report, the price of Spectrum common stock fell from roughly $6 11/16 per share to $4 3/8 per share. Later that same day, John Sculley ("Sculley"), Chairman and CEO of Spectrum from October 1993 to February 1994, denied Dorfman's report, calling it "bizarre," and the stock price partially recovered to $6 5/16 per share at closing. The next day, Spectrum confirmed the existence of the SEC Inquiry and Spectrum's stock again fell, closing at $5 7/8 per share. (Mathews, Joint Ex. 39 ¶¶ 20-21, 25-28; Bilunka, Joint Ex. 42 ¶¶ 18-20, 40, 42-44, 47-52; Grossman, Joint Ex. 41 at 6-7; Meyers, Joint Ex. 43 ¶¶ 64, 90-94, 96, 123(i); Stern, Joint Ex. 75 ¶¶ 19, 24-28.)

2. Restatement Claims

The complaints also allege that Spectrum made false and misleading public statements regarding its earnings ("Restatement Claims"): Initially, Spectrum announced profits of $0.01 per share for the first and second quarters of fiscal year 1994. It filed its Forms 10-Q with the SEC containing this information on August 16, 1993 for the first quarter and on November 15, 1993 for the second quarter. On February 7, 1994, the same day that Sculley announced his resignation, Spectrum declared that it would restate its earnings for the first and second quarters of the 1994 fiscal year. Because the accounting methods previously used were improper, Spectrum stated that it would report a loss of $2,390,000 or $0.03 per share for the first quarter, and a loss of $5,315,000 or $0.07 per share for the second quarter. The complaints claim that certain directors and officers falsely stated Spectrum's earnings to inflate the price of the stock to facilitate their alleged insider trading. (Mathews, Joint Ex. 39 ¶¶ 38, 40; Bilunka, Joint Ex. 42 ¶¶ 32-39, 56-58; Meyers, Joint Ex. 43 ¶¶ 70-71, 84-85, 106.)

3. Insider Trading Claims

The complaints additionally allege that several of Spectrum's officers and directors engaged in insider trading in November and December 1993 by exercising their options to purchase Spectrum stock based on material, adverse information ("Insider Trading Claims"): Peter Caserta ("Caserta"), Vice President and Chairman of Spectrum, exercised options to acquire 1,000,000 shares of Spectrum's stock at $1.125 per share and then sold those shares on the open market at an average of $9.50 per share; Salvatore Marino ("Marino"), a Director and Vice President of Spectrum, exercised options to acquire 300,000 shares at $1.125 per share and then sold those shares in the open market at an average of $8.71 per share; Albert Panico ("Panico"), a Director and Vice President of Spectrum, exercised options to acquire 330,000 shares at $1.125 per share and then sold those shares in the open market at an average of $8.55 per share; and A. Werner Pleus ("Pleus"), a Director and Executive of Spectrum, exercised options to acquire 30,000 shares at $1.33 per share and then sold those shares in the open market at an average of $8.66 per share. (Mathews, Joint Ex. 39 ¶¶ 22-24, 29; Bilunka, Joint Ex. 42 ¶¶ 59-71; Grossman, Joint Ex. 41 ¶¶ 5-6; Meyers, Joint Ex. 43 ¶¶ 20, 78-81, 97; Stern, Joint Ex. 75 ¶¶ 20-22, 29.)

4. Sculley Claims

Finally, several of the complaints allege that Sculley made false and misleading public statements ("Sculley Claims"): When Spectrum announced on October 18, 1993 that Sculley, formerly the Chairman of Apple Computer, was to become its next Chairman and CEO, the price of Spectrum stock rose roughly 5½ points to $11 1/8 per share. Caserta, Marino, and Panico hired Sculley to inflate the price of Spectrum stock, thereby enabling their insider trading in November 1993. When Dorfman revealed the SEC Inquiry on January 24, 1994, he also reported that Sculley would be resigning from Spectrum. Sculley, as mentioned, falsely denied the SEC Inquiry and additionally announced that he had no plans to leave Spectrum. On February 7, 1994, Sculley announced his resignation *833 from Spectrum. (Mathews, Joint Ex. 39 ¶¶ 30-37; Meyers, Joint Ex. 43 ¶¶ 73-77, 90-96, 108; Stern, Joint Ex. 75 ¶ 26.)

E. The Consolidated Action
After the filing of the Renewal Lawsuits containing the SEC Inquiry Claims, the Restatement Claims, the Insider Trading Claims, and the Sculley Claims, they were consolidated with the AT & T Lawsuits ("Consolidated Class Action Lawsuit"). Subsequently, in February 1994, plaintiffs in this consolidated action filed a Supplemental Consolidated Amended Class Action Complaint (Margulis Aff.Ex. G), and in April 1994, they filed a Second Consolidated Amended Class Action Complaint (Margulis Aff.Ex. H), which each procedurally incorporated all these claims.[4]

F. Relevant Policy Provisions
Several of the parties' arguments focus on various policy provisions contained in the Renewal and Excess Policies as well as in an additional policy issued by Agricultural Excess and Surplus Insurance Company ("AESIC").[5] (See Margulis Aff.Ex. D; Medina Aff.Ex. B; Ahari Aff.Ex. 20.) The first provision governs whether a claim is first made during the Renewal Policy Period, thereby implicating the Renewal Policy's terms and conditions. Section I of the Renewal Policy, titled "Insuring Agreement" ("Section I"), provides as follows:
Subject to the limit of liability, the Insurer shall pay loss arising solely by reason of any wrongful act on or after the policy retroactive date alleged in a claim first made against the assureds and reported in writing to the Insurer during the policy period.

(Emphasis added.) A "claim" is defined in Section II(B) of the Renewal Policy as "a written demand by a third party for monetary damages, including the institution of suit or a demand for arbitration." "Loss" is defined relative to the amounts paid on claims:
The term "loss" shall mean the percentage ... the assureds are obligated to pay solely by reason of any claim insurable hereunder in respect of their legal liability....
If a claim is considered first made within the Renewal Policy Period, Home and Aetna then rely on a number of policy exclusions to avoid liability. Section III.B of the Renewal Policy ("Section III.B") provides in pertinent part as follows:
The insurer shall not be liable to make any payment for loss arising from, by reason of or in connection with:

....
(B) any circumstances of which notice of claim or potential claim has been reported or for which the assured or the company are entitled to coverage under any insurance policy(s) (including any discovery period applicable thereto) in force prior to the policy period[.]
(Emphasis added.) Another exclusion is Endorsement No. 17 of the Renewal Policy *834 ("Endorsement No. 17"), which provides in pertinent part as follows:
The Insurer shall not be liable to make any payment for loss arising from any claim based upon or arising from any essential facts or circumstances underlying or alleged in any manner which prior to the effective date of this policy have been the subject of notice to any "insurance company" of (i) claims, or (ii) threat of claims, or (iii) occurrences or circumstances which might give rise to claims, under any preexisting policy of which this policy is a renewal or replacement or which it may succeed in time.
(Emphasis added.)
A similar exclusion is contained in Endorsement No. 3 of the Excess Policy ("Endorsement No. 3"):
In consideration of the premium charged, the Underwriter shall not be liable to make any payment for loss in connection with any claim made against any of the Insureds based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(a) any prior and/or pending litigation as of 6-26-93; or
(b) any fact, circumstance or situation underlying or alleged in any prior and/or pending litigation as of 6-26-93.
(Emphasis added.) Coverage under this provision will be barred if the requirements of either section (a) or (b) are satisfied.
The final provision containing this type of language is Endorsement No. 2, titled "General Limitation of Coverage," contained in AESIC's policy ("Endorsement No. 2"), which the Excess Policy incorporates:
It is understood and agreed that the Insurer shall not be liable to make any payment for [l]oss based upon, attributable to, directly or indirectly arising from, related to, or in consequence of any fact, circumstance or situation which has been the subject of any notice given prior to the effective date of this Policy under any insurance policy providing protection for the Directors and Officers including any matter in any way related thereto.
(Emphasis added.)[6]
In addition, Home and Aetna rely on Section IV(C), titled "Limit of Liability" of the Renewal Policy ("Section IV(C)"),[7] which provides as follows:
All claims arising from the same wrongful act or interrelated, repeated or continuous wrongful acts of one or more assureds shall constitute a single claim and shall be deemed to be a claim first made and reported to the Insurer in the policy period in which the first such wrongful act is reported to the Insurer in accordance with Clause VI(A).
(Emphasis added.)[8]

G. The Parties' Arguments
Home and Aetna make several arguments in their effort to avoid liability under the Renewal and Excess Policies. First, they argue that coverage is barred because Spectrum failed to disclose the SEC Inquiry when it applied for the Renewal and Excess Policies. Specifically, they contend that Spectrum had a duty to disclose the SEC Inquiry in response to Paragraphs 7(b) and (c) of Home's Renewal Policy application and Paragraphs 11(a)(2) and (c) of Aetna's Excess Policy application, and that its failure to do so constitutes grounds for rescission. Home additionally claims that Spectrum's failure to disclose was fraudulent. Spectrum denies that it had an obligation to disclose the SEC *835 Inquiry, and that, in any event, its nondisclosure was not material or justifiably relied upon by Aetna or Home to warrant rescission.
In the alternative, Home and Aetna rely on several policy provisions. They first argue that Spectrum has not filed a "claim" within the Renewal Policy Period. In that regard, they contend that a "claim" within the meaning of Section I of the Renewal Policy means the Consolidated Class Action Lawsuit, and therefore owes its genesis to the Original Policy Period when the AT & T Lawsuits were commenced. Spectrum, on the other hand, asserts that the additional allegations contained in the Renewal Lawsuits  namely, the Restatement Claims, the Insider Trading Claims, and the Sculley Claims  are distinct "claims" from the AT & T Lawsuits and the SEC Inquiry Claims, which they admit are not covered by the Renewal or Excess Policies, and that these distinct "claims" were first made in February 1994, during the Renewal Policy Period.
Home and Aetna then argue that, even if the Restatement Claims, the Insider Trading Claims, and the Sculley Claims are distinct "claims" which were first made within the Renewal Policy Period, they are excluded from coverage by several of the policies' exclusions because they generally arose from the same facts and circumstances underlying the AT & T Lawsuits. Spectrum disagrees, contending that these are separate claims and are based on factual circumstances distinct from the claims contained in the AT & T Lawsuits.

H. Issues for the Court to Resolve
The Court's determinations are therefore predicated upon the resolution of the following issues: (1) whether Home and/or Aetna are entitled to rescission; if not, (2) whether the Restatement Claims, the Insider Trading Claims, and/or the Sculley Claims constitute claims first made during the Renewal Policy Period; and if so, (3) whether the policy exclusions in the Renewal or Excess Policies apply to bar coverage for these claims.

II.

RESCISSION
Under New York law, an insurer may rescind an insurance policy which was issued in reliance on material misrepresentations.[9] N.Y.Ins.Law § 3105 (McKinney 1985); Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan, 77 F.3d 48, 52 (2d Cir.1996) ("Under New York law, ... an insurance policy issued in reliance on material misrepresentations is void from its inception[,]" and thus, subject to rescission.); Aetna Casualty and Surety Co. v. Retail Local 906 of AFL-CIO Welfare Fund, 921 F.Supp. 122, 131 (E.D.N.Y.1996) (Wexler, J.). The insurer has the burden of establishing both that there has been a misrepresentation and that the misrepresentation was material. Id. at 131.

A. Misrepresentation
Section 3105(a) of New York's Insurance Law defines "misrepresentation" as a false "statement as to past or present fact, made to the insurer by ... the applicant for insurance or the prospective insured, ... as an inducement to the making thereof." The concept of misrepresentation encompasses both false affirmative statements and the failure to disclose where such duty to disclose exists. Retail Local 906, 921 F.Supp. at 131 ("[T]he `"[f]ailure to disclose is as much a misrepresentation as a false affirmative statement."'") (quoting Mutual Benefit Life Ins. Co. v. Morley, 722 F.Supp. 1048, 1051 (S.D.N.Y.1989) (quoting Vander Veer v. Continental Casualty Co., 34 N.Y.2d 50, 52, 312 N.E.2d 156, 157, 356 N.Y.S.2d 13, 14 (1974))).

1. The Duty to Disclose

In general, "[a]n applicant for insurance is under no duty to volunteer information where no question plainly and directly *836 requires it to be furnished." Vella v. Equitable Life Assurance Soc'y, 887 F.2d 388, 392 (2d Cir.1989). This circumscribed duty to disclose does not, however, apply to all types of insurance. In marine insurance, for example, courts impose the doctrine of "uberrimae fidei," which requires "the parties to a marine insurance policy ... [to] accord each other the highest degree of good faith." Knight v. United States Fire Ins. Co., 804 F.2d 9, 13 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); see Black's Law Dictionary 1520 (6th ed.1990) (defining the term in part as "[t]he most abundant good faith; absolute and perfect candor or openness and honesty"). The Second Circuit has explained this duty as follows:
This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk being insured. Since the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire.
Knight, 804 F.2d at 13; see In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 80-81 (2d Cir.1996). The rationale for the higher standard of disclosure in marine insurance is predicated upon the historic absence of standard form applications coupled with the familiarity of the insured with this special type of insurance. As the Second Circuit explained many years ago:
In the case at bar the defendant did not set a questionnaire to the plaintiff which he might assume to be exhaustive. This type of insurance business has not developed to a point where, as is true with fire and life insurance, the issuance of a policy is based upon the answers made to questions contained in a standard form of application.
....
Probably the rule requiring that fraudulent intent be proved to support the defense of concealment in fire and life insurance cases rests largely upon the fact that ordinarily the insured has not sufficient acquaintance with the insurance business to enable him to judge when the insurer will consider a fact material to the risk.
Hare & Chase, Inc. v. National Sur. Co., 60 F.2d 909, 911-12 (2d Cir.), cert. denied, 287 U.S. 662, 53 S.Ct. 222, 77 L.Ed. 572 (1932).
The more stringent marine standard has also been applied in cases involving reinsurance contracts. See, e.g., Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 278 (2d Cir.1992) ("The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware."); Stephens v. American Home Assurance Co., 811 F.Supp. 937, 949 (S.D.N.Y. 1993), vacated and remanded on other grounds by Stephens v. National Distillers & Chem. Corp., 70 F.3d 10 (2d Cir.1995). In dicta, the Second Circuit has explained the rationale for applying this heightened standard:
[B]ecause information regarding risks lies with the ceding insurer, the reinsurance market depends upon a high level of good faith to ensure prompt and full disclosure. Absent such disclosure, reinsurers would have to duplicate actuarial and claims-handling efforts of ceding insurers, and reinsurance would become unavailable.
Unigard Sec. Ins. Co. v. North River Ins. Co., 4 F.3d 1049, 1066 (2d Cir.1993) (noting cases and commentators that have questioned the continued appropriateness of the more stringent rule in the reinsurance context).
The Court does not consider D & O insurance to be sufficiently similar to either marine insurance or reinsurance to warrant the application of the more stringent rule. There is nothing so unique about D & O policies that should elevate the duty to disclose to a higher standard than the general disclosure rule. Indeed, courts have invariably applied the ordinary New York standard, rather than the more stringent rule, to insurance cases not involving marine insurance or reinsurance. See In re Balfour, 85 F.3d at 81 (applying "ordinary" New York standard for disclosure, rather than the doctrine of utmost good faith, to "inland marine" matters, such as warehouse storage risks); Vella, 887 F.2d at 392 (evaluating special *837 occupational disability insurance policy under ordinary standard); Hare & Chase, 60 F.2d at 911 ("[T]he modern tendency is `to require that a non-disclosure of a fact not inquired about shall be fraudulent, before vitiating the policy.'") (quoting Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Trust Co., 72 F. 413, 441 (6th Cir.1896)); Retail Local 906, 921 F.Supp. at 131 (applying ordinary standard to pension and welfare fund fiduciary responsibility insurance policy); Sebring v. Fidelity Phenix Fire Ins. Co. of N.Y., 255 N.Y. 382, 386, 174 N.E. 761, 762 (1931) (applying ordinary standard to fire insurance policy); Boyd v. Otsego Mut. Fire Ins. Co., 125 A.D.2d 977, 510 N.Y.S.2d 371, 372 (4th Dep't 1986) ("Under the rules applying to forms of insurance other than marine, an applicant is ordinarily permitted to remain silent on matters concerning which he is not questioned."); accord Collins v. Pioneer Title Ins. Co., 629 F.2d 429, 433 (6th Cir.1980) ("In the ordinary practice the duty of disclosure has been relaxed. Most insurers require an applicant for insurance to answer questions prepared by it; `information not asked for is presumably deemed immaterial.'") (quoting Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928)).
Under the ordinary New York rule of disclosure, then, a court must consider whether the questions on an insurance application are "`so plain and intelligible that any applicant can readily comprehend them[,]'" and must construe any ambiguity in favor of the insured. Vella, 887 F.2d at 392 (citation omitted); Nadel v. Manhattan Life Ins. Co., 211 A.D.2d 900, 901, 621 N.Y.S.2d 180, 182 (3d Dep't 1995) (same); accord Woods v. National Life and Accident Ins. Co., 380 F.2d 843, 850 n. 22 (3d Cir.1967) (acknowledging the Pennsylvania Supreme Court's tendency to construe questions in an insurance application against the insurer); Fitzgerald v. Franklin Life Ins. Co., 465 F.Supp. 527, 535 (D.Md.1979) ("If the application form prepared by the insurance company is ambiguous, it must be construed in a manner favorable to the policyholder."), aff'd, 634 F.2d 622 (4th Cir.1980); General Accident Ins. Co. of Am. v. Hyatt Legal Servs., 130 A.D.2d 970, 972, 516 N.Y.S.2d 560, 561 (4th Dep't 1987) (applying the principle that the policy should be construed "in favor of the ... insured and in accordance with the understanding of the average person"); see also Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir.1993) ("Contract language is ambiguous if it is `"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."'") (quoting Walk-In Medical Ctrs. Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir.1987)) (additional quotation omitted). Ambiguity must be construed in favor of the insured because of the drafters' control over the provision's language:
Conditions and provisos must be strictly construed against the insurers, because they have for their object to limit the scope and defeat the purpose of the principal contract; and as the insurer prepares the contract and furnishes the language used, any ambiguity in the contract must be taken most strongly against him.
Dilleber v. Home Life Ins. Co., 69 N.Y. 256, 264 (1877) (citation omitted), quoted in Vella, 887 F.2d at 391.
Home and Aetna argue that Paragraphs 7(b) and (c) of the Renewal Policy and Paragraphs 11(a)(2) and (c) of the Excess Policy required Spectrum to disclose the SEC Inquiry. The Court addresses each provision seriatim.

2. Paragraphs 7(b) and 11(a)(2)

Home and Aetna contend, based on the questions contained in Paragraphs 7(b) and 11(a)(2) of their respective applications, that Spectrum had a duty to disclose the SEC Inquiry because it constituted a "proceeding" within the meaning of the applications. Again, Paragraph 7(b) of Home's application asked whether Spectrum and/or any of its directors or officers had been involved within the past eighteen months in "any civil or criminal action or proceeding investigating or charging a violation of any federal or state *838 security law or regulation?" (Emphasis added.) Spectrum answered "no." Using language similar to that in Paragraph 7(b), Paragraph 11(a)(2) of Aetna's application asked whether "any person or entity proposed for this insurance [had] been a party to any of the following:.... Any civil, criminal or administrative proceeding alleging or investigating a violation of any security law or regulation?" (Emphasis added.) In response, Spectrum listed the AT & T Lawsuits, but did not mention the SEC Inquiry.
Home and Aetna argue that the term "proceeding" as used in these Paragraphs should be interpreted according to its ordinary dictionary meaning:
A course of action.... Continuation of an action.... A succession of events taking place at a specific place or occasion.... An official record of business conducted by an organization.... The act of instituting or conducting litigation.
Webster's II New Riverside University Dictionary 938 (1988). In the alternative, they argue that the Court should rely on Black's legal definition of "proceeding," the relevant portions of which they quote as follows:
(1) "[i]n a general sense, the form and manner of conducting juridical business before a court or judicial officer," (2) "[a]n act which is done by the authority or direction of the court, agency or tribunal"; and (3) "`proceeding' may refer not only to a complete remedy but also to a mere procedural step that is part of a larger action or special proceeding."
(Aetna's Mem.Supp.Summ.J. at 15 n. 9) (citing Black's Law Dictionary 1204 (6th ed.1990)).
Spectrum, on the other hand, urges the Court to adopt the SEC's technical definition of "proceeding":

Proceeding means any agency process initiated by an order instituting proceedings; or by the filing, pursuant to § 201.410, of a petition for review of an initial decision by a hearing officer; or by the filing, pursuant to § 201.420, of an application for review of a self-regulatory organization determination; or by the filing, pursuant to § 201.430, of a notice of intention to file a petition for review of a determination made pursuant to delegated authority[.]
(Defs.' Mem. Opp'n at 25 (relying on 17 C.F.R. § 201.101(a)(9))).
The appropriate inquiry is whether the applicant plainly understood the import of the terms used on the applications. Because the focus is on how an applicant would interpret the applications' questions, the Court must rely on the meaning of the term with which an applicant is most likely familiar. See, e.g., Berger v. Manhattan Life Ins. Co., 805 F.Supp. 1097, 1107 (S.D.N.Y.1992) (stating that ambiguity in insurance policy should be considered according to "`the understanding of a person engaged in the insured's course of business'") (quoting In re Ambassador Group, Inc. Litig., 738 F.Supp. 57, 63 (E.D.N.Y.1990)) (additional quotations and citations omitted).
Paragraphs 7(b) and 11(a)(2) of Home's and Aetna's respective applications did not plainly require the disclosure of the SEC Inquiry. Once again, the letter Spectrum received from the SEC stated that the SEC had initiated an "informal inquiry" and requested that Spectrum "voluntarily" produce copies of certain documents relating to its agreement with AT & T. (Ahari Aff.Ex. 7.) The letter further stated that it was "confidential" and "should not be construed as an indication by the Commission ... that any violations of law ... [had] occurred, nor should it be considered an adverse reflection upon any persons, entities or securities." Id. The Court concludes that the word "proceeding" as used in the context of both Paragraphs 7(b) and 11(a)(2) suggests something more formal than an "informal inquiry."
In any event, the term "proceeding" is, at best, here ambiguous because it is not so plain and intelligible that the applicant could comprehend its meaning to include this informal inquiry. Even Luis Roman ("Roman"), Home's managing underwriter, conceded that the language of Home's application did not clearly require an applicant to disclose an informal SEC inquiry:
THE COURT: Nothing in your application form ... specifically asks whether there are any inquiries from the SEC?
[ROMAN]: See 

*839 THE COURT: Maybe the application today is different.
[ROMAN]: No, but it's understood that's so material to the coverage at hand that anything to do with the SEC has to be disclosed.
THE COURT: Understood by whom, you?
[ROMAN]: By me, the broker.
THE COURT: In the industry?
[ROMAN]: Yes, D and O. Anything with D and O has to do with the SEC, has to be disclosed.
THE COURT: That may be your understanding but is it fair to assume that's the understanding of an applicant of Spectrum or any other entity seeking coverage?

[ROMAN]: That's a hard question.

(Tr. at 255-56) (emphasis added). Such ambiguities must be construed against the drafters. Indeed, Home and Aetna, as the drafters, could easily have fashioned more specific questions relating to potential SEC involvement, and one might have expected as much considering that both Roman and Jose Medina ("Medina"), Aetna's underwriter, testified to the large percentage of losses sustained by D & O providers attributable to SEC related matters. (Tr. at 136, 256.)
In sum, Paragraphs 7(b) and 11(a)(2) did not plainly require Spectrum to disclose the SEC Inquiry, and thus, there was no misrepresentation warranting rescission.

3. Paragraph 7(c)

Home implausibly argues that Spectrum failed to disclose the SEC Inquiry in response to Paragraph 7(c) which inquired regarding Spectrum's involvement in "any other litigation other than ordinary routine litigation incident to the business of the Applicant Corporation (and/or its subsidiaries) and/or its directors and officers." (Emphasis added.) Plainly, the SEC Inquiry did not constitute any type of litigation.

4. Paragraph 11(c)

Finally, Aetna argues that Spectrum's failure to disclose the SEC Inquiry in response to its Paragraph 11(c) constituted a misrepresentation. Again, Paragraph 11(c) states that
No person or entity proposed for this insurance is cognizant of any fact, circumstance or situation which they have reason to suppose might afford valid grounds for any claim such as would fall within the scope of the proposed insurance, except as follows (if answer is "none", so state)[.]
(Emphasis added.) Spectrum answered "none."
The Court concludes that Spectrum's response to Paragraph 11(c) also does not constitute a misrepresentation because Spectrum had already disclosed the facts, circumstance, or situation underlying the SEC Inquiry via its disclosure of the AT & T Lawsuits in response to Paragraph 11(a)(2):
Yes. Recent class action suit alleges Spectrum overstated potential revenue from a recent AT & T deal. Attorneys for Insured as well as auditors feel the suit will be dismissed.
Moreover, Paragraph 11(c) required Spectrum to assess whether a claim arising from this same fact, circumstance or situation "would fall within the scope of the proposed insurance." The Court does not find it unreasonable for Spectrum to have concluded that a claim arising from the SEC Inquiry would not have fallen within the scope of the proposed insurance because the SEC Inquiry involved the same facts alleged in the AT & T Lawsuits and would likely be excluded under any one of a number of general exclusions routinely included in claims made policies. See, e.g., Section III.B, Endorsement No. 17, Endorsement No. 3, Endorsement No. 2.
The decision in International Surplus Lines Ins. Co. v. University of Wyo. Research Corp., 850 F.Supp. 1509 (D.Wyo.1994), aff'd, 52 F.3d 901 (10th Cir.1995), which involved a provision similar to that contained in Paragraph 11(c), is not to the contrary. The district court there focused on the phrases "has reason to suppose" and "[v]alid grounds for a future claim," id. at 1520-22, rather than on whether the fact, circumstance, and situation had already been disclosed or might be expected to implicate the proposed insurance. *840 Moreover, unlike here, in University of Wyo. there had been no disclosure prior to the issuance of the policy regarding the facts underlying the insured's eventual claim under the policy. Id. at 1513-17.
Thus, based on the factual allegations in the present case, the Court concludes that Paragraph 11(c) did not plainly require the disclosure of the SEC Inquiry.

5. Fraudulent Concealment

The Court is also mindful that merely because an insurance application does not clearly require the disclosure of specific information does not mean that there are no circumstances that might warrant disclosure. On the contrary, the duty to disclose is not limited to information requested in an insurance application where nondisclosure would be tantamount to fraudulent concealment. Retail Local 906, 921 F.Supp. at 132 ("[W]here the nondisclosure, as to a matter which the insured has not been directly asked, constitutes fraud, the policy may be voided.") (citing Sebring, 255 N.Y. at 387, 174 N.E. at 762-63); Lighton v. Madison-Onondaga Mut. Fire Ins. Co., 106 A.D.2d 892, 892-93, 483 N.Y.S.2d 515, 516 (4th Dep't 1984) ("Fraudulent concealment may void an insurance policy, even if the fact concealed was not one inquired into by the insurer.") (citation omitted). For the nondisclosure to rise to the level of fraudulent concealment, it must have been done in "`bad faith with intent to mislead the insurer.'" Retail Local 906, 921 F.Supp. at 132 (citing Sebring, 255 N.Y. at 387, 174 N.E. at 763); Sun Ins. Co. of N.Y. v. Hercules Sec. Unltd., Inc., 195 A.D.2d 24, 30, 605 N.Y.S.2d 767, 771 (2d Dep't 1993) ("In order to constitute fraud, there must be a willful intent to defraud and not a mere mistake or oversight.").
There has been no showing of fraudulent concealment in this case. The Court finds significant the fact that Home was aware that Spectrum did not disclose the 1990 SEC inquiry on Spectrum's 1992 application for insurance with Home, but took no action against Spectrum. (Joint Ex. 6 at 2; Tr. at 234, 273.) In addition, as already discussed, Home and Aetna were already aware of the facts underlying the SEC Inquiry through Spectrum's disclosures of the AT & T Lawsuits. Something more is required than the facts in this case to establish fraudulent concealment.
These facts distinguish this case from Republic Ins., 77 F.3d at 48, recently decided by the Second Circuit. There, the insurer, Republic Insurance Company, submitted evidence that the insured, certain pension and retirement plans, not only failed to disclose information but also made affirmative false statements in its application for insurance. Id. at 52. As elucidated by the court:
Republic submitted evidence that, in their policy applications, the Plans falsely stated that Plan investments were under the control of an independent investment manager, when in fact certain Plan trustees were participating in investment decisions. In response to a question inquiring whether any Plan trustees were aware of potential claims, the Plans failed to disclose that they had made investments prohibited by Plan guidelines, and that they were under investigation by the Department of Labor. Republic also showed that the Plans failed to disclose an internal investigation to determine whether any investments violated ERISA.
Id. The court viewed these facts as tantamount to fraud, noting that "[i]n the court below, none of the defendants offered any substantial rebuttal to Republic's showing of fraud." Id. at 52. The facts here do not rise to a similar level of egregiousness.

B. Materiality
Even if there was a duty to disclose the SEC Inquiry under the applicable portions of the Renewal and Excess Policies, the Court concludes that this information was not material to Home's and Aetna's underwriting decisions. See Sebring, 255 N.Y. at 386, 174 N.E. at 762 ("Duty to disclose a material fact manifestly is not the same thing as materiality itself.").
Section 3105(b) of New York's Insurance Law provides that a misrepresentation is material if "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer" to make the contract. *841 Courts have expanded this statutory definition of materiality somewhat to allow an insurance company to "avoid liability on the policy by showing that had it known the truth it would not have issued the exact same policy it did issue." Vella, 887 F.2d at 391 (emphasis added). As the Second Circuit has explained:
The question ... is not whether the company might have issued the policy even if the information had been furnished; the question in each case is whether the company has been induced to accept an application that it might otherwise have refused.
Mutual Benefit Life Ins. Co. v. JMR Electronics Corp., 848 F.2d 30, 32 (2d.Cir.1988) (quoting Geer v. Union Mut. Life Ins. Co., 273 N.Y. 261, 269, 7 N.E.2d 125, 128 (1937)). Thus, "[i]f a fact is material to the risk, the insurer may avoid liability under a policy if that fact was misrepresented in an application for that policy whether or not the parties might have agreed to some other contractual arrangement had the critical fact been disclosed." Id. at 34.
In deciding the question of materiality, a court must consider whether the alleged misrepresentations were material at the time the contract was entered into, Christiania Gen. Ins. Corp., 979 F.2d at 279, based on, inter alia:
[E]vidence of the insurer's practice with respect to similar risks, as shown by such documents as the insurer's underwriting manuals or rules, and by testimony of a qualified employee of the insurer that the insurer would not have issued the particular contract it did had the facts been disclosed.
Cohen v. Mutual Benefit Life Ins. Co., 638 F.Supp. 695, 697 (E.D.N.Y.1986) (Bartels, J.) (discussing type of evidence necessary to determine materiality as a matter of law on summary judgment motion); see Berger, 805 F.Supp. at 1103. Nevertheless, "a conclusory statement by an insurance company employee that it would not have insured the applicant if it had known [the truth] ... is, in and of itself, insufficient to establish that a misrepresentation was material." Wittner v. IDS Ins. Co. of N.Y., 96 A.D.2d 1053, 466 N.Y.S.2d 480, 481 (2d Dep't 1983).
Based on all the circumstances, the Court concludes that Home and Aetna have not factually sustained their burden of establishing the materiality of the SEC Inquiry to their underwriting decisions.

1. The Dearth of Evidence in Support of the Underwriters' Conclusions

Both Medina and Roman testified that they would not have issued the same policies if they had known about the SEC Inquiry. (Tr. at 145-46, 199, 262-64.) However, absent was any evidence tending to support their conclusions. Neither Home's nor Aetna's underwriting manuals addressed the weight that should be accorded to an SEC inquiry. As Medina conceded:
Q: [I]sn't it true that even though this manual here lists factors such as financial strength, litigation, mergers and acquisitions, salaries or management, that there's absolutely no reference in this entire manual to the term SEC [i]nformal [i]nquiry?
[MEDINA]: It's in very general terms, and has not gone into any of the very specifics.
Q: ... There's no reference in the entire manual to the term SEC informal inquiry, is there?
[MEDINA]: No, there's not a reference to specifically the SEC informal inquiry.
(Tr. at 177; see Tr. at 193.) Roman testified similarly:
Q: ... Mr. Roman, isn't it true that there was not a single written Home underwriting manual during this period of time telling an underwriter what to do with a D and O application where the applicant had received an SEC informal inquiry ...?
....
[ROMAN]: In the manual? No.
(Tr. at 269.)
In addition, neither Home nor Aetna provided evidence relating to the effect they had given to SEC inquiries in their underwriting *842 of other cases. When the Court questioned Medina in that regard, he was unable to provide any specific information. For example:
THE COURT: [I]n the past have you received any disclosures about SEC inquiries in any of your applications that you have processed for the purposes of providing excess insurance coverage?
[MEDINA]: I have.
....
THE COURT: Can you quantify how often this has happened?
[MEDINA]: Unfortunately, no, I cannot.
THE COURT: Do you have available copies of these applications?
[MEDINA]: I no longer work at Aetna. I don't have access to them.
....
THE COURT: Do you know any situation where disclosure was made about any inquiry by the SEC which resulted in the denial in issuance of an excess policy?
[MEDINA]: I cannot recall one in particular.

(Tr. at 132-34) (emphasis added).

2. Home's Prior Course of Dealing With Spectrum

Not only was there a dearth of evidence to support Medina's and Roman's conclusions, but there was also evidence which affirmatively undercut the importance that they attributed to the SEC Inquiry. Significantly, both Medina and Roman emphatically maintained that SEC involvement was critical because it represented a large percentage of losses sustained by D & O insurers. (Tr. at 136, 256.) Yet, Roman's testimony revealed a contrary course of dealing between Home and Spectrum. See Farnsworth on Contracts II § 7.13 at 282-83 (1990) (discussing the importance of a prior course of dealing between the parties involving similar transactions to the contract being interpreted). Roman acknowledged that, at the time Spectrum applied for the Original Policy, he was aware of a 1990 SEC informal inquiry regarding sales of restricted stock by certain Spectrum officers and directors and the issuance of promotional materials by Spectrum between January 1988 and October 1990. He maintained that Home's 1992 application, which contained the same language as Home's 1993 application, required Spectrum to reveal this SEC inquiry. Roman nevertheless issued the Original Policy, taking no action with respect to Spectrum's alleged nondisclosure in the 1992 application. Notwithstanding his inaction in 1992, he maintained that Spectrum's similar failure to disclose the SEC Inquiry in Home's 1993 application would have made a significant difference in his underwriting decision. He testified as follows:
Q: And it's your testimony here today that Spectrum should have answered question 7 on that [1993] renewal application "yes" because it had received an informal inquiry in 1993, isn't that right?
[ROMAN]: Correct.
Q: Let's just look back to question 7 B on the original application which again goes back ten years.
Can you just look at that for me, question 7 B on the [O]riginal [Policy] application.
[ROMAN]: Yes.
Q: Spectrum answered "no" to this question also, didn't they?
[ROMAN]: Correct.
....
Q: And yet you never notified Spectrum at least in your view that they had given an erroneous answer to question 7 in 1992, did you?
[ROMAN]: No.
Q: And you also never notified Spectrum's brokers that in your view they had given an erroneous answer to question 7 on the original application, did you?
[ROMAN]: That's correct.
Q: And despite the existence of the 1990 SEC inquiry, and Spectrum's false answer, in your opinion, to question 7, you in fact issued Spectrum a two million *843 dollar D and O policy for 1992, did you not, Mr. Roman?

[ROMAN]: Yes.
(Tr. at 272-73) (emphasis added).

3. The Information Regarding the Risks Involved

Equally important, both Medina and Roman were fully aware of the allegations contained in the AT & T Lawsuits, which undisputedly involved the same facts on which the SEC Inquiry focused. Roman conceded that these same allegations would likely draw the attention of the SEC:
THE COURT: .... [B]ased on your experience as an underwriter, your expertise, is it reasonable to expect that when you have a scenario such as represented in this case of a brief period of volatility in the stock that went up to 13, going down to 5, the class action, the litigation that was commenced in May of '93, the perusal of all those allegations by you, the careful attention you paid to the entire AT & T scenario, is it reasonable to expect that the SEC may have sent some letter of inquiry to conduct further types of investigations or proceedings?
[ROMAN]: Yes.
THE COURT: That's a reasonable expectation, isn't it?
[ROMAN]: Yes.
....
If you're saying reasonably to be expected, I would say yes, 50/50 shot, a chance that the SEC is going to look at this.
Id. at 294-95. Given this "reasonable expectation," the claimed significance of the SEC Inquiry is questionable.
Moreover, Medina and Roman knew that loss arising from or related to the facts underlying the AT & T Lawsuits would be excluded by the Renewal and Excess Policies. (See Section III.B, Endorsement No. 17, Endorsement No. 3, Endorsement No. 2.) Indeed, Spectrum has conceded that loss arising from the SEC Inquiry would be so excluded precisely because it is based on the same alleged facts contained in the AT & T Lawsuits. (Tr. at 354, 360, 362.)
Armed with full knowledge of the AT & T Lawsuits, the expectation of the SEC Inquiry into the AT & T scenario, and a host of exclusionary clauses to protect them against any AT & T fallout, Home and Aetna capitalized by charging a significantly higher premium than was customary. Medina testified that he saw several red flags  Spectrum's past financial losses (Tr. at 149), recent stock volatility (Tr. at 153), the AT & T Lawsuits (Tr. at 160), and Spectrum's susceptibility to a takeover (Tr. at 173)  and consequently charged Spectrum a premium of approximately $105,000, more than four times the usual amount charged for $2,000,000 of excess coverage. (Tr. at 182-83.)
In sum, Medina's and Roman's unsupported contention that the SEC Inquiry would have made a material difference to their underwriting decisions is unpersuasive in light of: Home's prior course of performance with Spectrum, the likelihood of an SEC inquiry, Home and Aetna's full awareness of the facts underlying the SEC Inquiry, their protection against loss, and their willingness to insure Spectrum notwithstanding several other substantial risk factors. Accordingly, the Court concludes that, even if Spectrum had a duty to disclose the SEC Inquiry, Aetna and Home have not met their burden of establishing the materiality of the SEC Inquiry to their underwriting decisions. If Spectrum is precluded from coverage under the Renewal and Excess Policies, it must be a consequence of the various policy provisions, to which the Court next turns its attention.

III.

POLICY PROVISIONS

A. Declaratory Judgment
The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that a federal court may "[i]n a case of actual controversy within its jurisdiction ... declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Although the determination of whether to allow declaratory relief is a matter of the trial court's discretion, Continental Casualty *844 Co. v. Coastal Sav. Bank, 977 F.2d 734, 736 (2d Cir.1992), the touchstone of the Court's determination must be the Constitution's Article III requirement that there be an actual controversy rather than a mere abstract question. See Starter Corp. v. Converse, Inc., 84 F.3d 592, 594-95 (2d Cir.1996) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Moreover, as the Second Circuit has explained:
[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.
Continental Casualty Co., 977 F.2d at 737 (citing Broadview Chem. Corp. v. Loctite Corp., 417 F.2d 998, 1001 (2d Cir.1969), cert. denied, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970)); see Mitcheson v. Harris, 955 F.2d 235, 239 (4th Cir.1992) (a court should consider whether "its resolution of the declaratory action will settle all aspects of the legal controversy."); Eureka Fed. Sav. & Loan Assoc. v. American Casualty Co. of Reading, Pa., 873 F.2d 229, 231 (9th Cir. 1989) ("[D]eclaratory relief is appropriate `(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'") (quoting Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (9th Cir.1984)) (additional citation omitted).
As noted, the Consolidated Class Action Lawsuit has been settled for approximately $10,000,000 conditioned upon the $4,000,000 which is here at issue. The coverage issues before the Court are independent from and will not be resolved in the underlying action. Cf. American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 766 (2d Cir.1984) (reviewing decisions holding that declaratory relief was appropriate where the insurer could not intervene in or the issues could not be raised in the underlying lawsuit, but concluding that its case was factually distinguishable). Moreover, the parties do not contest the appropriateness of declaratory relief. For the Court to deny declaratory relief in this situation would force the Consolidated Class Action Lawsuit to proceed to trial, "turn[ing] the reality of the claims adjustment process on its head to hinge justiciability of an insurance agreement on the maturation of a suit to a judgment when the overwhelming number of disputes are resolved by settlement." ACandS, Inc. v. Aetna Casualty & Sur. Co., 666 F.2d 819, 823 (3d Cir.1981); see Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 681 (7th Cir.1992) (Posner, J.) (finding declaratory relief regarding insurer's obligation to indemnify insured appropriate even though the underlying litigation could render the issue moot). The Court thus concludes that declaratory relief is appropriate here because the parties have shaped a settlement agreement in a costly, complex litigation and the Court's determinations with respect to the Renewal and Excess Policies may very likely resolve the remaining disputes between the parties.

B. Interpretation of Insurance Policies
Construction of an insurance policy, like other contracts, is decided by courts as a matter of law. See Christiania Gen. Ins. Corp., 979 F.2d at 274. Under New York law, which here applies,[10] a court must interpret an insurance policy "to give effect to the intent of the parties as expressed in the clear language of the contract[ ]" and to enforce its clear and unambiguous provisions. Village of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir.1995) (citations omitted). A contract provision is unambiguous where it "has `a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Sayers, 7 F.3d at 1095 (quoting Breed v. Insurance Co. of N. Am., 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978)). Where the policy language is ambiguous, on the other hand, the court should consider extrinsic evidence to determine *845 the parties' intent. McCostis v. Home Ins. Co. of Ind., 31 F.3d 110, 113 (2d Cir. 1994). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent," the ambiguity must be interpreted in favor of the insured. Id. In addition, with respect to exclusionary provisions, "[t]he insurer generally bears the burden of proving that the claim falls within the scope of an exclusion," Sylvan Beach, 55 F.3d at 115 (citation omitted), by demonstrating that the "`exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'" Id. at 115-16 (quoting Sea Ins. Co. v. Westchester Fire Ins. Co., 51 F.3d 22, 26 (2d Cir.1995)).
With these principles in mind, the Court considers whether any claims were first made during the Renewal Policy Period and, if so, whether any of the exclusions relied upon by Home and/or Aetna apply to exclude coverage.
As an initial matter, Spectrum has conceded that the Renewal and Excess Policies do not provide coverage for loss arising from: (1) the AT & T Lawsuits because they were brought during the Original Policy Period and were based on events occurring exclusively during the Original Policy Period; and (2) the SEC Inquiry Claims because they were based entirely on the subject matter of the AT & T Lawsuits, and thus, are excluded from coverage. As Spectrum's counsel stated:
What is curious about this case is this is not a situation where we're seeking to hold the insurance company responsible to respond in damages for the SEC investigation or for the AT & T matter which comprehends the SEC investigation, that is excluded from their policy.

They are arguing their policy ought to be vitiated even though they excluded past claims. If you take on its face or in any way their contention about the scope of their claims, their claims certainly  the prior claims would certainly include, and therefore exclude from coverage, expenses or costs or losses associated with the SEC inquiry or the later SEC investigation.

So they protected themselves against these acts by excluding them.
(Tr. at 354) (emphasis added). Sculley's counsel similarly conceded that loss arising from the SEC Inquiry would be excluded:
One of the things that distinguishes this case from the other cases where the issue of materiality has been litigated is that the subject matter of this application that the plaintiffs allege was omitted, that is the SEC inquiry, is not covered by this policy; it's otherwise excluded.

....
[It is excluded because i]t relates to the AT & T thing. That's what the SEC inquiry letter was all about. The AT & T thing was the subject of the suits that were also happening at that time of which notice was specifically given; so that anything arising out of an SEC inquiry or investigation into SEC related matters is covered by their exclusion.

(Tr. at 360, 362) (emphasis added).

C. Whether Any Claims Were First Made Under Section I of the Renewal Policy

1. The Meaning of "Claim"

The evaluation of whether the Renewal Lawsuits filed in 1994, or any portions thereof, constituted "claims first made" within the Renewal Policy Period such that the Renewal and Excess Policies apply invariably begins with the definition of "claim." As noted above, Section II(B) of the Renewal Policy defines "claim" as "a written demand by a third party for monetary damages, including the institution of suit or a demand for arbitration." Home and Aetna contend that the Second Consolidated Amended Class Action Complaint, which represents the consolidation of all of the various class action lawsuits, including the AT & T Lawsuits and the Renewal Lawsuits, constitutes one "claim." As Home argues:
Here, the "claim," [is] the entire lawsuit, [because it] seeks damages for violation of the securities laws, based on the allegations as a whole, not the separate allegations as defendants would have this Court believe.
*846 (Home's Reply Mem.Supp. at 1; see Aetna's Reply Mem.Supp. at 1.) Based on this definition of "claim," Home and Aetna maintain that because the earliest of the Consolidated Class Action Lawsuits  the AT & T Lawsuits  were filed during the Original Policy period, the entire Consolidated Class Action Lawsuit was a "claim first made" during the Original Policy Period, and thus, the Renewal and Excess Policies do not apply. Spectrum, on the other hand, argues that the Restatement Claims, the Insider Trading Claims, and the Sculley Claims, which were first contained in the Renewal Lawsuits, each represent a separate "claim" within the meaning of Section I. The Court concludes that the meaning of "claim" in Section I is unambiguous because there is only one reasonable interpretation of "claim"  that proffered by Spectrum.
Courts have found that the term "claim" as used in liability insurance policies is unambiguous and generally means a demand by a third party against the insured for money damages or other relief owed. See, e.g., In re Ambassador Group, 830 F.Supp. at 155 (stating that, for purposes of statutory interpleader analysis, "a[n insurance] claim is a demand for specific relief owed because of alleged wrongdoing."); Evanston Ins. Co. v. Security Assurance Co., 715 F.Supp. 1405, 1412 (N.D.Ill.1989) ("[T]he Policy uses ... [claim] `in its common (and common sense) usage: an effort by a third party to recover money from the insured'[.]") (quoting National Union Fire Ins. Co. v. Continental Ill. Corp., 673 F.Supp. 300, 307 n. 17 (N.D.Ill. 1987)); Bensalem Township v. Western World Ins. Co., 609 F.Supp. 1343, 1348 (E.D.Pa.1985) ("The case law generally supports the conclusion that, for purposes of determining coverage under a `claims made' policy, a `claim' is `a demand for something as a right.'") (quoting Phoenix Ins. Co. v. Sukut Constr. Co., 136 Cal.App.3d 673, 677, 186 Cal.Rptr. 513, 515 (1982)), rev'd on other grounds, 38 F.3d 1303 (3d Cir.1994); National State Bank v. American Home Assurance Co., 492 F.Supp. 393, 396 (S.D.N.Y.1980) (concluding that "claim" was not an ambiguous term because it "consistently ... [referred] to an assertion of a legal right by a third-party against the insured" even though it was not defined in policy); Heen & Flint Assocs. v. Travelers Indem. Co., 93 Misc.2d 1, 4, 400 N.Y.S.2d 994, 996 (1977) (finding "claim," defined in the policy in part as "any demand for money or services," unambiguous and referring to its common meaning as a "demand against the insured"); Safeco Title Ins. Co. v. Gannon, 54 Wash.App. 330, 334, 774 P.2d 30, 33 (1989) (although not defined in policy, "claim" was unambiguous and given its plain and ordinary meaning of "a demand for compensation"); Doctor's Co. v. Insurance Corp. of Am., 864 P.2d 1018, 1024-27 (Wyo.1993) (policy definition of "claim" as "a demand for money, services or property" unambiguously meant "a demand for something as a right or as due") (quoting Abifadel v. Cigna Ins. Co., 8 Cal.App.4th 145, 160, 9 Cal.Rptr.2d 910, 920 (1992)); see also Calocerinos & Spina Consulting Eng'rs, P.C. v. Prudential Reinsurance Co., 856 F.Supp. 775, 778 (W.D.N.Y.1994).
Home and Aetna's proposed definition of "claim" as synonymous with the Consolidated Class Action Lawsuit strains the language of the Renewal Policy, and thus, does not render ambiguous an otherwise unambiguous term. See Colson Servs. Corp. v. Insurance Co. of N. Am., 874 F.Supp. 65, 68 (S.D.N.Y. 1994) ("[A]n ambiguity is not created simply because the parties to an insurance contract put forward different interpretations of its terms, particularly `where one of two competing constructions is strained or unnatural.'") (quoting County of Schenectady v. Travelers Ins. Co., 48 A.D.2d 299, 301, 368 N.Y.S.2d 894, 897 (3d Dep't 1975)). Their definition would equate "claim" and "suit" notwithstanding that these terms are treated as separate concepts by the plain language of the Renewal Policy. Once again, Section II(B) of the Renewal Policy defines "claim" as "a written demand by a third party for monetary damages, including the institution of suit or a demand for arbitration." (Emphasis added.) Under this definition, there may be a "claim" without the institution of a "suit" (e.g., by demanding arbitration without or before filing a suit), or a "suit" that does not necessarily constitute a "claim" (e.g., by filing a suit after arbitration has been demanded). Thus, because the concepts are *847 distinct, a "suit" may contain several discrete "claims," as in this case.
The Court concludes that Spectrum's proposed definition captures the essence of this distinction between "claim" and "suit." The Restatement Claims, the Insider Trading Claims, and the Sculley Claims each represent discrete demands for money damages notwithstanding that they were procedurally brought together in one suit. See, e.g., Ameriwood Indus. Int'l Corp. v. American Casualty Co. of Reading, Pa., 840 F.Supp. 1143, 1153-54 (W.D.Mich.1993) (discussing separate claims contained in the "Four Fraud Suits" for relation-back purposes); St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Guar. Co., 2 Haw.App. 595, 596-97, 637 P.2d 1146, 1147 (1981) (treating multiple negligence claims as discrete claims even after two were consolidated in one suit because policy referred to "claim" and "suit" as separate concepts). Likewise, the fact that these claims were later consolidated with the earlier-filed claims incorporated in the AT & T Lawsuits or that the complaint in the Consolidated Class Action Lawsuit was subsequently amended does not alter their status as discrete claims. In sum, what Spectrum's proposed definition captures, and Home and Aetna fail to appreciate, is that the concept of "claim" within the meaning of insurance policies is textual rather than procedural.
Home's reliance on Goldstein v. North Jersey Trust Co., 39 F.R.D. 363 (S.D.N.Y.1966), which discussed the definition of "claim" within the broad context of Federal Rule of Civil Procedure 12(b)(6), is misplaced. In Goldstein, the court interpreted "claim" within the meaning of Rule 12(b)(6) as "`the aggregate of operative facts which give rise to a right enforceable in the courts.'" 39 F.R.D. at 366 (citation omitted). Home's attempt to apply Rule 12(b)(6)'s definition of "claim" in a wholly distinct context, especially given the Renewal Policy's more circumscribed definition, is unwarranted. Similarly misplaced is Home's reliance on Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir.1994), to support its contention that "the Second [Consolidated Amended Class Action] Complaint superseded all complaints that had previously been filed, and rendered those complaints of no legal effect." (Home's Mem.Supp. at 8.) In Shields, the court addressed the question of whether a defendant had waived its right to move to dismiss an amended complaint pursuant to Federal Rule of Civil Procedure 9(b) where it had answered the original complaint without raising the Rule 9(b) defense. 25 F.3d at 1128. It was in this context that the court stated: "`an amended complaint ordinarily supersedes the original, and renders it of no legal effect.'" Id. (citations omitted). That the complaints filed in the Renewal Lawsuits ceased to have "legal effect" for procedural purposes after those actions were consolidated with the AT & T Lawsuits has no bearing on the nature of the claims contained therein or on the applicability of the Renewal and Excess Policies to those claims. Informix Corp. v. Lloyd's of London, No. C-91-1506-FMS, 1992 WL 469802, at *2 (N.D.Cal. Oct. 15, 1992), is also distinguishable. In Informix, the policy at issue uniquely defined "claim" as "any judicial or administrative proceeding initiated against a Director or Officer in which such Director or Officer may be subjected to a binding adjudication of liability[.]" 1992 WL 469802, at *2.
The Court thus holds that the Restatement Claims, the Insider Trading Claims, and the Sculley Claims represent separate claims within the meaning of the Renewal Policy.

2. When the Claims Were First Made

The Restatement Claims, the Insider Trading Claims, and the Sculley Claims were "first made" during the Renewal Policy Period within the meaning of Section I because they were first reported in writing to Home and Aetna after the Renewal Lawsuits were filed in February 1994. Home and Aetna argue, however, that Section IV(C) of the Renewal Policy transforms the Restatement Claims, the Insider Trading Claims, and the Sculley Claims from claims first made during the Renewal Policy Period to claims first made during the Original Policy Period because they constitute "the same wrongful act or interrelated, repeated or continuous wrongful acts" as the first wrongful act reported. Again, Section IV(C) provides:

*848 All claims arising from the same wrongful act or interrelated, repeated or continuous wrongful acts of one or more assureds shall constitute a single claim and shall be deemed to be a claim first made and reported to the Insurer in the policy period in which the first such wrongful act is reported to the Insurer in accordance with Clause VI(A).
(Emphasis added.) The language of Section IV(C) focuses on "wrongful acts," which the policy defines in Section II(J) as "any actual or alleged breach of duty, error, misstatement, misleading statement or omission." The first wrongful act reported (Spectrum's claimed misstatements regarding its licensing agreement with AT & T alleged in the AT & T Lawsuits) represents a distinct act of wrongdoing from the alleged acts of wrongdoing articulated in the Restatement Claims (misstatements regarding earnings), the Insider Trading Claims (trading based on material nonpublic information), and the Sculley Claims (the failure to disclose the SEC Inquiry and/or Sculley's intention to leave Spectrum). See National Union Fire Ins. Co. v. Ambassador Group, Inc., 691 F.Supp. 618, 623 (E.D.N.Y.1988) (Dearie, J.) (finding in an interpleader action that the claims asserted in four actions did not arise out of the "same or interrelated acts" because they are "legally distinct claims that allege different wrongs to different people"). At best, Section IV(C)'s language is ambiguous, which requires a construction in favor of the insured. See, e.g., McCuen v. American Casualty Co. of Reading, Pa., 946 F.2d 1401, 1407-08 (8th Cir.1991) (commenting that the terms "similar" and "interrelated" in the phrase "same act, interrelated acts, or one or more series of similar acts ... shall be considered a single [l]oss[,]" were "so elastic, so lacking in concrete content, that they import into the contract, in our opinion, substantial ambiguities"). Expansive phrases such as "continuous wrongful acts" must have some practical boundary. Thus, the Court concludes that these subsequently alleged wrongful acts are not the same as, interrelated to, a continuation of, or repetitious of those contained in the AT & T Lawsuits. If coverage is barred, it must therefore be a consequence of one or more of the various exclusions, which the Court next addresses.

D. The Policy Exclusions
Unlike Section I, which focuses on whether a claim has been first made within the Renewal Policy Period, the exclusions generally focus on whether a "loss" incurred arises from or is in any way related to a fact, circumstance, or situation underlying or alleged in a claim, potential claim, or prior and/or pending litigation which was reported during and/or covered by a pre-existing policy (referred to hereafter as "related to a pre-existing policy period" unless otherwise indicated). The exclusions are also distinct from Section IV(C), which focuses on the acts of wrongdoing themselves, rather than the facts, circumstances, or situations underlying a loss.
Notwithstanding the breadth of the exclusions, a court must strictly and narrowly construe such provisions. Cone v. Nationwide Mut. Fire Ins. Co., 75 N.Y.2d 747, 749, 551 N.E.2d 92, 93, 551 N.Y.S.2d 891, 892 (1989) ("The exclusion from coverage ... [is] always as a matter of interpretation construed strictly against the insurer[.]"); Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 311, 476 N.E.2d 272, 275, 486 N.Y.S.2d 873, 876 (1984) ("Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction."). The strict construction of insurance provisions is driven by the insurer's power to craft the language "to limit the scope and defeat the purpose of the principal contract[.]" Dilleber, 69 N.Y. at 264 (citation omitted), quoted in Vella, 887 F.2d at 391. It is the insurer who has the burden of demonstrating that the language of the exclusion "clearly and unmistakably" applies. Sylvan Beach, 55 F.3d at 115-16; Sea Ins. Co., 51 F.3d at 26. Moreover, the insurer here must show that the exclusions apply to the facts as alleged in the complaints because there has been no determination of liability. See Ameriwood Indus., 840 F.Supp. at 1152 (comparing the allegations contained in the original and second amended complaint when applying the prior and/or *849 pending litigation exclusion); Informix, 1992 WL 469802, at *3 (same); Bensalem Township v. International Surplus Lines Insurance Co. Crum & Forster Managers Corporation, 1992 WL 142024, at *2 (1992) (stating that the prior and/or pending litigation exclusion of the policy "looks to underlying facts" rather than the legal theories plead or additional defendants named). The Court thus considers each of the claims alleged in the Renewal Lawsuits in light of the various exclusions.

1. Restatement Claims

The Renewal Lawsuits allege that Spectrum's Forms 10-Q, filed with the SEC on August 16, 1993 and November 15, 1993, contained false and misleading statements of its earnings and were designed to facilitate the alleged insider trading by Caserta, Marino, and Panico. As presented, these claims not only arise from facts which occur exclusively during the Renewal Policy Period but also describe wrongs which are factually and legally distinct from the prior claims alleged against Spectrum. Consequently, if liability were to be proven on these claims, the loss incurred would not be related to a pre-existing policy period by reason of the AT & T Lawsuits (concededly covered by the Original Policy), or the SEC Inquiry Claims (concededly excluded from coverage under the Renewal or Excess Policies), within the meaning of Section III.B, Endorsement No. 17, Endorsement No. 3, or Endorsement No. 2. Because Home and Aetna have failed to demonstrate any nexus between these claims and the subject matter of either the AT & T Lawsuits or the SEC Inquiry Claims, the Court concludes that Home and Aetna have not established the applicability of these exclusions to the alleged facts.

2. The Insider Trading Claims

Several of the Renewal Lawsuits allege that Caserta, Marino, Panico, and Pleus engaged in insider trading in November and December 1993, during the Renewal Policy Period, by exercising their options to purchase Spectrum stock based on material, adverse, non-public information. However, these complaints do not clearly identify, and the Court cannot discern without factual development, whether the material, adverse, non-public information underlying the alleged insider trading was the SEC Inquiry, the restatement of earnings, Sculley's tenure at Spectrum, or some other relevant information. In the absence of further factual development, the Court must limit itself to the language of the exclusions, which it may interpret as a matter of law. Based on the plain language of the exclusions, the Court concludes that if the information underlying the insider trading was the SEC Inquiry, then loss arising from the insider trading would be excluded from coverage because it would be "related" to the SEC Inquiry, which in turn "arose" from the subject matter of the AT & T Lawsuits. A contrary conclusion would be inconsistent with the exclusion of the SEC Inquiry Claims. Again, as counsel for Spectrum and Sculley conceded, "losses associated with the SEC inquiry or the later SEC investigation" (Tr. at 354), or "anything arising out of an SEC inquiry or investigation into SEC related matters is covered by their exclusion." (Tr. at 362.) If, on the other hand, the insider trading was based upon facts or circumstances that occurred within the Renewal Policy Period, such as Spectrum's August and November 1993 restatement of earnings, then loss arising therefrom would be covered by the Renewal and Excess Policies.

3. The Sculley Claims

Unlike the Insider Trading Claims, the Sculley Claims expressly reference the SEC Inquiry. The Renewal Lawsuits assert that Sculley falsely denied the SEC Inquiry and denied that he had any intention of leaving Spectrum. Although the Court is mindful that Sculley was associated with Spectrum during only the Renewal Policy Period and that his alleged nondisclosure occurred during the Renewal Policy Period, if the information he failed to disclose was the SEC Inquiry, then loss arising from his nondisclosure would be excluded. This conclusion seems inescapable considering that without the SEC Inquiry, which directly arose from the AT & T Lawsuits, there would be nothing to disclose. In this regard, the Sculley Claims would be indistinguishable from the *850 SEC Inquiry Claims, which also allege the nondisclosure of the SEC Inquiry. If, on the other hand, loss were to arise from Sculley's failure to disclose information not related to a pre-existing policy period (e.g., his alleged misleading statements regarding his intention to leave Spectrum), then that loss would be covered by the Renewal and Excess Policies.

* * *
Home and Aetna's arguments in support of the application of the various exclusions, like their contentions regarding the definition of "claim," are once again inappropriately based on a conflation of the concepts of "suit" and "claim." For example, Home argues that the Renewal Lawsuits allege the same conduct as the AT & T Lawsuits because the Renewal Lawsuits also contain allegations regarding the AT & T licensing agreement:
At the foundation of this course of conduct are the allegations, contained in every complaint filed against defendants, that defendants hyped and overexaggerated the value of a licensing agreement between Spectrum and AT & T.
....
The fact that the [Renewal Lawsuits] expand upon the factual allegations against defendants does not alter the conclusion that those lawsuits were based upon or arose out of any essential facts underlying or alleged in the earlier lawsuits.... The conduct [alleged in the Renewal Lawsuits] is the same [as that alleged in the AT & T Lawsuits], it is merely alleged to have continued for a longer period of time.
(Home's Mem.Supp.Summ.J. at 11, 13-14) (emphasis in original). Aetna similarly emphasizes that the restatement of the allegations underlying the AT & T Lawsuits in the Renewal Lawsuits precludes coverage for the Restatement Claims, the Insider Trading Claims, and the Sculley Claims. (Aetna's Reply Mem.Supp. at 2.) As the Court has explained, however, the concept of "claim" is distinct from that of "suit," and neither the initial amalgamation of claims in one suit nor the variety of procedural metamorphoses which a suit often undergoes, whether via consolidation or amendment, alters the distinctive nature of individual claims or the consequent loss potentially incurred therefrom.
The cases on which Home and Aetna rely to invoke the applicability of the exclusions all focus on whether there was a sufficient factual nexus for the exclusion to apply and, accordingly, are consistent with the Court's conclusions. For example, in Comerica Bank v. Lexington Ins. Co., 3 F.3d 939 (6th Cir.1993), the court concluded that subsequent litigation was excluded under the prior and pending litigation provision because it was based on the same agreement to sell stock as were the earlier-filed suits. Id. at 944. In Bensalem Township, the "two actions [there] involve[d] the same underlying circumstance: Blanche Road Corporation's development of the Blanche Road Industrial Park, and Bensalem Township's alleged attempts to interfere with such development." 1992 WL 142024, at *2. In Ameriwood Indus., the court concluded, inter alia, that Count II of the second amended complaint in the "Alizac Action" was excluded because it alleged the same omissions in the same proxy literature as had the original complaint filed in the prior policy period, 840 F.Supp. at 1152, and that the "Kent County Action" was excluded because it focused on the same "Poison Pill" as had an earlier-filed "Atlantis Action." Id. at 1153. Finally, the court in Unified Sch. Dist. N. 501 v. Continental Casualty Co., 723 F.Supp. 564 (D.Kan.1989), excluded coverage for an intervenors' action brought in the ongoing school desegregation case of Brown v. Board of Educ. of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), because that action clearly arose out of outstanding litigation.[11]Id. at 567.
The Court also finds unpersuasive Home and Aetna's attempt to intertwine the Restatement Claims, the Insider Trading Claims, and the Sculley Claims by relying on naked allegations in the original complaints that they represent mere pieces of a larger "scheme" to artificially inflate Spectrum's *851 stock prices. Although the loss arising from the Insider Trading Claims or the Sculley Claims would be excluded if these claims are found to be based on the SEC Inquiry, bald allegations of conspiracy are insufficient to enmesh otherwise distinct claims. See Bensalem Township, 1992 WL 142024, at *2 (emphasizing that courts should evaluate exclusion based on the underlying facts rather than the legal theories plead or additional defendants named).
In sum, the Court holds that the Restatement Claims, the Insider Trading Claims, and the Sculley Claims are claims first made within the Renewal Policy Period. Moreover, any loss incurred from the Restatement Claims as alleged would be covered by the Renewal and Excess Policies. With respect to the Insider Trading Claims and the Sculley Claims, however, the Court cannot definitively conclude that the exclusions either apply or do not apply without additional factual development, but notes that these claims would be excluded by the Renewal and Excess Policies insofar as they are premised on the SEC Inquiry or are otherwise related to a pre-existing policy period.

IV.

CONCLUSION
Home and Aetna are not entitled to rescission of the Renewal or Excess Policies and that aspect of the complaint is dismissed. With respect to the declaratory relief claims, the Court declares that: (1) the Restatement Claims, the Insider Trading Claims, and the Sculley Claims are claims first made within the Renewal Policy Period; (2) any loss incurred from the Restatement Claims would be covered by the Renewal and Excess Policies; and (3) any loss incurred from the Insider Trading Claims and the Sculley Claims would be covered by the Renewal and Excess Policies if these claims are determined not to be based on the SEC Inquiry and are not otherwise related to a pre-existing policy period within the meaning of the exclusions.
SO ORDERED.
NOTES
[1] A "claims made" policy covers claims which are reported during the policy period regardless of the occurrence date. A claims made policy is the alternative to an "occurrence" policy, the other typical insurance policy, which covers occurrences during the policy period regardless of the claim date. Calocerinos & Spina Consulting Eng'rs P.C. v. Prudential Reinsurance Co., 856 F.Supp. 775, 777 (W.D.N.Y.1994). In Calocerinos, the court explained the rationale underlying a claims made policy:

Claims made insurance has become popular in part because it benefits both the insurer and the insured. The insurer knows that there is a date after which it will not be responsible for claims. With this knowledge, the insurer is able to compute premiums with greater certainty, because it can discount the risk of a claim filed long after the policy period has ended, with the attendant dangers of unexpected inflation, changes in application of law, and upward trends in jury awards. This greater certainty results in lower premiums for the insured.
Id. at 777-78.
[2] The complaints filed in these suits are found in Joint Exhibits 13-14 and 56-71. In general, the complaints focus on an alleged statement made on May 11, 1993 by Peter T. Caserta, the President, Chief Executive Officer, and Vice Chairman of the Board of Spectrum at that time, that the pact between AT & T and Spectrum would be one of the most important licensing agreements of the decade, generating hundreds of millions of dollars in royalties from the equipment sold by AT & T and its affiliates. On May 20, 1993, an AT & T spokesperson allegedly described Caserta's statement as a "gross exaggeration." Other actions which contained similar allegations were commenced in June and September 1993. See, e.g., Joint Exs. 23, 72, 73.
[3] "Tr." refers to the transcript of the bench trial held before the Court on February 28 and 29, 1996.
[4] These claims were incorporated in the Supplemental Consolidated Amended Class Action Complaint as follows: the SEC Inquiry Claims were incorporated in ¶¶ 77, 84-88 (Margulis Aff.Ex.G at 40-41, 44-45); the Restatement Claims were incorporated in ¶¶ 60-66 (Id. at 34-37); the Insider Trading Claims were incorporated in ¶¶ 73-77 (Id. at 39-41); and the Sculley Claims were incorporated in ¶¶ 17-18 (Id. at 13-15). These claims also appear in the Second Consolidated Amended Class Action Complaint as follows: the SEC Inquiry Claims are contained in ¶¶ 68, 92, 98-102 (Margulis Aff.Ex.H. at 46, 55, 59-61); the Restatement Claims are contained in ¶¶ 73-74, 95-96, 113 (Id. at 48-49, 58-59, 65); the Insider Trading Claims are contained in ¶¶ 82-85, 92, 105 (Id. at 53-54, 55, 62); and the Sculley Claims are contained in ¶¶ 78-81, 93-94, 99, 103-104 (Id. at 51-53, 56-58, 60-62).
[5] AESIC issued a $1,000,000 Excess Directors' and Officers' Liability Insurance Policy for the Renewal Policy Period, but is not a party to the instant action. (Defs.' Mem.Opp'n Summ.J. at 2 n. 3.) This AESIC policy is relevant, however, insofar as Home and Aetna both incorporate certain portions of the AESIC Renewal Policy. Aetna's statement filed pursuant to Civil Rule 3(g) for the Southern and Eastern Districts of New York states:

As provided in the Insuring Agreement of the Aetna Excess Policy, the Aetna Excess Policy adopts the same terms and conditions as the underlying AESIC Renewal Policy (which in turn follows form to the Home Renewal Policy), except as otherwise provided in the Aetna Excess Policy.
(Aetna 3(g) ¶ 31.)
[6] Aetna relies on the policy provisions contained in the Home Renewal Policy and the AESIC policy in addition to the provisions from its own policy. See supra note 5.
[7] The Renewal Policy lists "Exclusions" and "Limit of Liability" in separate sections although both have an exclusionary effect if applicable.
[8] Clause VI(A)(i) provides:

The date of loss from any claim within the meaning of this policy shall be the date on which the assureds and/or the company shall give written notice of claim to the Insurer as provided herein.
The Renewal Policy defines "wrongful act" in Section II(J) as:
[A]ny actual or alleged breach of duty, error, misstatement, misleading statement or omission done or attempted by the assureds solely in their capacity as directors and/or officers of the company and alleged by any third party claimant.
[9] The parties do not contest the applicability of New York law. And, if the Renewal and Excess Policies apply, Section VI(C) of the Renewal Policy expressly calls for New York law to govern. The Excess Policy does not appear to contain a choice of law provision, but because of its "follow form" nature, incorporates the provisions of the Renewal Policy as the primary policy. See supra note 5.
[10] See supra note 9.
[11] With respect to Informix, 1992 WL 469802, at *3, the Court simply cannot discern the facts which drove that court's determination that the additional allegations in the amended complaint were part of the same claim articulated in the original complaint.